1   Laura E. Muschamp (AZ Bar # 017531)
    lmuschamp@cov.com
2   COVINGTON & BURLING LLP
    9191 Towne Centre Drive
3   6th Floor
    San Diego, CA 92122-1225
4   T: (858) 678-1803
    F: (858) 678-1603
5
    Michael M. Markman (*Pro Hac Vice*)
6   mmarkman@cov.com
    Robert J. Williams (*Pro Hac Vice*)
7   rwilliams@cov.com
    COVINGTON & BURLING LLP
8   One Front Street
    San Francisco, CA 94111-5356
9   T:  (415) 591-7000
    F:  (415) 955-6520
10
    Attorneys for Defendant
11  *Phoenix Newspapers, Inc., d/b/a*
    *The Arizona Republic*
12

13

14                      UNITED STATES DISTRICT COURT

15                     FOR THE DISTRICT OF ARIZONA

16
    Helferich Patent Licensing, LLC          Civil Case No.: 2:11-cv-02304 PHX DGC
17
            Plaintiff,
18                                           **ANSWER, DEFENSES, FIRST**
            v.                               **COUNTERCLAIM, AMENDED**
19                                           **SECOND COUNTERCLAIM, AND**
    Suns Legacy Partners LLC, et al.         **JURY DEMAND**
20
            Defendants.
21

22

23          Defendant Phoenix Newspapers, Inc. ("PNI") answers the Complaint of

24  Helferich Patent Licensing, LLC ("HPL") as follows:

25                          <u>**NATURE OF THE ACTION**</u>

26          1.      PNI admits the allegations of Paragraph 1.

27                          <u>**JURISDICTION AND VENUE**</u>

28          2.      PNI admits that it does business in the State of Arizona and in this

District.  PNI denies that it has engaged in caused infringing messages to be sent to anyone, including residents of this State and District.  Except as expressly admitted, PNI otherwise denies the allegations of paragraph 2.

3.     PNI admits that venue is permitted in this judicial district at the present time pursuant to 28 U.S.C. § 1400(b), but denies that venue is "appropriate."  PNI further denies that it has caused infringing messages to be sent to anyone, including residents of this State and District.

**PLAINTIFF**

4.     PNI is informed and believes that Plaintiff is an Illinois Limited Liability Corporation.  PNI otherwise lacks information sufficient to form a belief as to the truth of the allegations in Paragraph 4, and on that basis denies them.

5.     PNI admits that U.S. Patent No. 7,835,757 ("the '757 patent") is entitled "System and Method For Delivering Information To a Transmitting and Receiving Device" and that it purports to have been issued by the U.S. Patent and Trademark Office ("PTO") on November 16, 2010.  PNI lacks information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 5, and on that basis denies them.

6.     PNI denies the allegations of Paragraph 6 of the Complaint.  PNI denies that the '757 patent describes "methods and systems relating to wireless messaging to mobile devices."  As described in the specification and prosecution history of the '757 patent, and as further described in the context of the PTO's recent reexamination of that patent, the '757 patent describes and claims an extremely limited method requiring a user of a mobile handset to perform a specific set of tasks in order to be able to access specific types of information on a handset.  Further, in reexamination proceedings, the PTO has rejected the notion that the '757 patent claims "relate to, among other things, the transmission of notification messages to mobile devices that include identifiers (such as a URL) that identify content available for download, including for example, identifiers that are received from an identification service such as a link shortening service."  For example, "SMS messages that include an identifier of content (such as a URL) in the message, and where the identified content is updated and/or changed by the

content provider between the time the notification is sent and the time the content is requested" is unquestionably disclosed in prior art that the PTO has relied on to reject claims of the '757 patent.  To overcome such prior art, HPL has been forced to amend its claims to require that an identifier "establish[] to the recipient the address of the particular system to which to respond." See Advisory Action, App./Control No. 90/009,882, Oct. 21, 2011 at 9.  PNI also denies that the "examples" of allegedly infringing activities in Paragraph 6 meet the limitations of the '757 patent claims.

7.    PNI admits that U.S. Patent No. 7,499,716 ("the '716 patent") is entitled "System and Method For Delivering Information To a Transmitting and Receiving Device" and purports to have been issued by the PTO on March 3, 2009.  PNI lacks information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 7, and on that basis denies them.

8.    PNI denies the allegations of Paragraph 8 of the Complaint.  PNI denies that the '716 patent "describes methods and systems that relate to wireless messaging to mobile devices."   As described in the specification and prosecution history of the '716 patent, and as further described in the context of the PTO's reexamination, the '716 patent describes and claims an extremely limited system and method requiring a user of a mobile handset to perform a specific set of tasks in order to be able to access specific types of information on a handset. PNI also denies that the "examples" of allegedly infringing activities in Paragraph 8 meet the limitations of the '716 patent claims.  PNI further notes that, during ongoing reexamination of the '716 patent by the PTO, HPL made amendments to many claims of the '716 patents to further limit those claims.

9.    PNI admits that U.S. Patent No. 7,280,838 ("the '838 patent") is entitled "Paging Transceivers and Methods For Selectively Retrieving Messages" and purports to have been issued by the PTO on October 9, 2007.  PNI lacks information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 9, and on that basis denies them.

10.    PNI denies the allegations of Paragraph 10 of the Complaint.  PNI denies that the '838 patent "includes claims that relate to, among other things, the transmission of

1   notification messages to mobile devices that include identifiers (such as a URL) that identify

2   content available for download.  PNI also denies that SMS or MMS messages that include a

3   URL in the message are "examples" that will infringe the claims of the '838 patent.  PNI notes

4   that the PTO is reexamining the '838 patent, and that all claims of the '838 patent were rejected

5   by the PTO in an action dated September 28, 2011.  Those grounds of rejection were not

6   retracted as of the examiner's interview summary dated December 13, 2011.

7       11.    PNI is informed and believes that on July 14, 2010, HPL filed suit against

8   New York Times Company asserting infringement of the '757, '716, and '838 patents, that The

9   New York Times sought *ex parte* reexamination of those patents, and that the PTO found The

10  New York Times raised substantial questions of patentability concerning the three patents.  PNI

11  is aware that the PTO issued a Notice of Intent to Issue Reexamination Certificate of the '716

12  patent, and that HPL was forced to amend and narrow a substantial majority of the original

13  invalid claims of the '716 patent.  PNI is aware that only six of the original claims of the '757

14  patent were confirmed in reexamination.   PNI is also aware that only 16 claims of the '716

15  patent were confirmed in reexamination.  PNI is informed and believes, and therefore admits

16  that a Non-Final Office Action has been issued by the PTO with respect to the '838 patent, and

17  that multiple claims have been amended.  Except as so admitted, PNI lacks information

18  sufficient to form a belief as to the truth of the allegations of Paragraph 11 and on that basis

19  denies the allegations.

20      12.    PNI is informed and believes that the PTO also found that the prior art

21  explicitly teaches that "'identifiers' that 'indirectly' identify the content's location" were known

22  in the prior art.  PNI is informed and believes that HPL made statements after prosecution had

23  closed in the reexamination of the '716 patent.  PNI denies that statements made by HPL after

24  prosecution had closed did anything but narrow the scope of any claim.  PNI also specifically

25  denies that "the use of URL's (such as short links)" are covered by the claims of the '716 patent,

26  particularly since that technology is found in the prior art that was at issue in the reexamination.

27      13.    PNI is informed and believes, and therefore admits, that *inter partes*

28  reexamination requests were filed by, among others, The New York Times Co.  PNI is informed

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

4

1    and believes, and therefore admits, that those *inter partes* reexamination requests were denied as

2    the claims of the patents had at that been already been narrowed as a result of earlier *ex parte*

3    reexaminations.  PNI denies that the PTO has "disposed" of invalidity issues that can be raised

4    in reexamination.

5            14.     PNI lacks information sufficient to form a belief as to the truth of the

6    allegations of paragraph 14, particularly in light of recent activity in the PTO concerning the

7    '757 and '716 patents, and therefore denies the allegations.

8            15.     PNI lacks information sufficient to form a belief as to the truth of the

9    allegations of Paragraph 15 of the Complaint, and on that basis denies them.

10           16.     PNI is informed and believes that HPL has licensed the patents-in-suit,

11   and other patents, based on an established royalty, which would establish a cap on any potential

12   liability for PNI under 35 U.S.C. section 284.  PNI otherwise lacks information sufficient to

13   form a belief concerning the truth of the allegations of Paragraph 16, and on that basis denies

14   the allegations.

15                                    **THE DEFENDANT**

16           17.     PNI admits the allegations of Paragraph 17, except denies that it

17   "purposefully directs" any "infringing activities … to residents of this State and District" in any

18   way.

19           18.     PNI denies the allegations of Paragraph 18 and its sub-paragraphs.  PNI

20   notes that the allegations of Paragraph 18 mis-read the claims of the patents-in-suit, particularly

21   given the narrow scope afforded to the '757 and '716 patents in the course of reexamination of

22   those patents by the PTO.

23           19.     PNI admits that it received a letter dated November 5, 2010 from Steven

24   G. Lisa with the subject line "Helferich Patent Portfolio Related to Wireless Content Provision,"

25   which PNI attaches hereto as Exhibit 1.  PNI denies that the letter referenced in Paragraph 19

26   provided an accurate description of the claims of the '716 or '838 patents.  PNI further denies

27   that anything in the letters demonstrated any infringement of the claims of those patents, and

28   also denies that any of the letters included charts.  PNI notes that the claims of the '716 and '757

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

5

1   patents have not yet emerged from reexamination, have in many cases been amended, and so the

2   correspondence referenced in paragraph 18 of the complaint cannot act as notice sufficient to

3   trigger the provisions of 35 U.S.C. sections 284 paragraph 2 or 285.

4           20.     PNI denies the allegations of Paragraph 20, and further denies it infringes

5   any valid claim of the patents-in-suit.  It has not taken a license to the patents-in-suit for that

6   reason, among others.

7                           **COUNT I**

8           **(Alleged Infringement of United States Patent No. 7,835,757)**

9           21.     PNI incorporates by reference its answer to Paragraphs 1-20 of the

10  Complaint and re-alleges those allegations in response to Paragraph 21.

11          22.     PNI denies the allegations of Paragraph 22.

12          23.     PNI denies the allegations of Paragraph 23.

13          24.     PNI denies the allegations of Paragraph 24.

14          25.     PNI denies the allegations of Paragraph 25.

15          26.     PNI denies the allegations of Paragraph 26.

16          27.     PNI denies the allegations of Paragraph 27.

17                          **COUNT II**

18          **(Alleged Infringement of United States Patent No. 7,499,716)**

19          28.     PNI incorporates by reference its answer to Paragraphs 1-20 of the

20  Complaint and re-alleges those allegations in response to Paragraph 28.

21          29.     PNI denies the allegations of Paragraph 29.

22          30.     PNI denies the allegations of Paragraph 30.

23          31.     PNI denies the allegations of Paragraph 31.

24          32.     PNI denies the allegations of Paragraph 32.

25          33.     PNI denies the allegations of Paragraph 33.

26          34.     PNI denies the allegations of Paragraph 34.

27                          **COUNT III**

28          **(Alleged Infringement of United States Patent No. 7,280,838)**

35.    PNI incorporates by reference its answer to Paragraphs 1-20 of the Complaint and re-alleges those allegations in response to Paragraph 35.

36.    PNI denies the allegations of Paragraph 36.

37.    PNI denies the allegations of Paragraph 37.

38.    PNI denies the allegations of Paragraph 38.

39.    PNI denies the allegations of Paragraph 39.

40.    PNI denies the allegations of Paragraph 40.

41.    PNI denies the allegations of Paragraph 41.

**PRAYER FOR RELIEF**

PNI denies that HPL is entitled to any of the relief HPL seeks in its Prayer for Relief, and further denies that HPL is entitled to any injunction given its status as a non-practicing entity.

**DEFENSES**

Without altering the burdens of proof, PNI asserts the following affirmative and other defenses against HPL:

**FIRST DEFENSE**

**(INVALIDITY)**

1.    The asserted claims of the patents-in-suit are invalid for failing to meet one or more of the requisite statutory and/or decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, sections 101, 102, 103, 112, and 116.  The PTO's *ex parte* reexamination of the '838 patent is ongoing, and *inter partes* reexamination of the '716 patent has been requested, which counsels in favor of a stay of this action pending reexamination in order to address the invalidity of the asserted claims.  If and when a reexamination certificate issues with respect to any of the '757 and '838 patents, PNI intends to file a request for the PTO to conduct an *inter partes* reexamination of the '757 and/or '838 patents based on guidance set forth by the PTO in the context of the ongoing *ex parte* reexaminations, which further counsels in favor of a stay of this action pending reexamination in order to address the invalidity of the asserted claims.

**SECOND DEFENSE**

**(NON-INFRINGEMENT)**

2.      HPL is not entitled to any relief against PNI because PNI does not infringe and has not infringed, directly or indirectly, any valid claim of the patents-in-suit.

**THIRD DEFENSE**

**(PROSECUTION HISTORY ESTOPPEL)**

3.      Prosecution history estoppel bars HPL from proving infringement of any valid claim of the patents-in-suit under the doctrine of equivalents.  HPL is estopped from construing any valid claim of the patents-in-suit in such a way that may cover PNI's activities by reason of statements made to the PTO during the prosecution of the applications that issued as the patents-in-suit, and during reexamination proceedings for the '757, '716, and '838 patents.

**FOURTH DEFENSE**

**(NO INTENT TO INDUCE INFRINGEMENT)**

4.      PNI lacked and lacks any specific intent to infringe any claim of the patents-in-suit, thereby foreclosing liability for inducement of infringement.

**FIFTH DEFENSE**

**(INJUNCTIVE RELIEF NOT AVAILABLE)**

5.      Neither preliminary nor permanent injunctive relief are available to HPL under the legal standards for injunctions, and a compulsory licenses would be legal error, because, among other things, HPL cannot show irreparable harm, and the balance of hardships and public interest do not favor an injunction in this case.  *See eBay Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837 (2006).

**SIXTH DEFENSE**

**(FAILURE TO MARK)**

6.      HPL's right to seek damages and costs is limited pursuant to 35 U.S.C. § 287. PNI is informed and believes, and thereupon alleges, that HPL's licensees failed to mark allegedly patented systems and system components with the patents-in-suit.

**SEVENTH DEFENSE**

ANSWER, DEFENSES, FIRST COUNTERCLAIM, AMENDED SECOND COUNTERCLAIM, AND JURY DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

8

**(LIMITATIONS ON DAMAGES)**

7.      HPL's right to seek damages and costs is limited pursuant to 35 U.S.C. § 286. HPL's right to seek damages and costs is further limited for any alleged infringement of claims of the '757, '716, and '838 patents that were or are amended and that issue under a reexamination certificate; HPL cannot seek damages for such claims prior to the date of the reexamination certificate.

**EIGHTH DEFENSE**

**(EQUITABLE DEFENSES)**

8.      HPL is barred by the doctrines of estoppel, laches, unclean hands, waiver and/or other applicable equitable doctrines.

**NINTH DEFENSE**

**(INTERVENING RIGHTS)**

9.      The doctrine of intervening rights bars liability based on PNI's activities after issuance of a reexamination certificate for the '757, '716, and/or '838 patents with respect to any claim amended by HPL in the course of reexamination by the PTO of those patents where PNI is merely continuing the use of systems and methods that pre-date the reexamination certificate.

**TENTH DEFENSE**

**(PATENT EXHAUSTION AND/OR FIRST SALE)**

10.      HPL's claims of patent infringement against PNI relating to the transmission of messages to mobile devices are barred by the doctrine of patent exhaustion and/or by the first sale doctrine based on the licenses, between HPL and mobile device or mobile device software companies and others, including but not limited to those as alleged in paragraph 16 the complaint.

**<u>COUNTERCLAIMS</u>**

For its Counterclaims, Defendant and Counterclaimant PNI alleges against Plaintiff and Counterclaim Defendant HPL as follows:

**PARTIES**

1.      PNI is an Arizona corporation with its principal place of business in Phoenix,

ANSWER, DEFENSES, FIRST COUNTERCLAIM, AMENDED SECOND COUNTERCLAIM, AND JURY DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

9

1    Arizona.

2        2.      Based on the allegations of HPL's Complaint, PNI is informed and believes, and

3    thereupon alleges, that HPL is a Limited Liability Company with its principal place of business

4    in Chicago, Illinois.

5                                **JURISDICTION AND VENUE**

6        3.      This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 and 2202

7    of non-infringement and invalidity of the patents-in-suit under the United States patent laws, 35

8    U.S.C. §§ 101 *et seq*.  This Court has subject matter jurisdiction over this action pursuant to 28

9    U.S.C. §§ 1331 and 1338(a).

10       4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c), though

11   counterclaimant reserves the right to seek transfer of this action.

12                                **GENERAL ALLEGATIONS**

13       5.      On December 14, 2011, HPL filed suit against PNI, claiming infringement of the

14   patents-in-suit.

15       6.      A justiciable controversy exists between HPL and PNI concerning the non-

16   infringement and invalidity of the patents-in-suit.

17                                **FIRST COUNTERCLAIM**

18                        **(NON-INFRINGEMENT OF THE PATENTS-IN-SUIT)**

19       7.      PNI refers to and incorporates by reference Paragraphs 1-6 of its Counterclaims

20   as though fully set forth herein.

21       8.      PNI has not and is not now infringing, directly or indirectly, the claims of the

22   patents-in-suit asserted by HPL against PNI (the '757, '716, and '838 patents).

23       9.      PNI is entitled to a declaratory judgment that PNI does not infringe the asserted

24   claims of the patents-in-suit.

25                            **AMENDED SECOND COUNTERCLAIM**
                             **(INVALIDITY OF THE PATENTS-IN-SUIT)**
26

27       10.     PNI refers to and incorporates by reference Paragraphs 1-6 of its Counterclaims

28   as though fully set forth herein.

11.     The asserted claims of the patents-in-suit are invalid for failing to meet one or more of the requisite statutory and/or decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, sections 101, 102, 103, 112, and 116.

12.     For example, and without limitation, the patents-in-suit are invalid pursuant to 35 U.S.C. sections 102 and 103 based upon prior art that includes, but is not limited to: U.S. Patent Nos. 5,117,449 ("the '449 patent"), 5,255,305 ("the '305 patent"), 5,349,678 ("the '678 patent"), 5,406,616 ("the '616 patent"), 5,463,382 ("the '382 patent"), 5,487,100 ("the '100 patent"), 5,555,446 ("the '446 patent"), 5,809,415 ("the '415 patent"), 5,818,824 ("the '824 patent"), 5,845,202 ("the '202 patent"), 5,872,930 ("the '930 patent"), 5,878,351 ("the '351 patent"), 5,880,731 ("the '731 patent"), 5,893,091 ("the '091 patent"), 5,903,845 ("the '845 patent"), 5,933,478 ("the '478 patent"), 5,958,006 ("the '006 patent"), 6,018,774 ("the '774 patent"), 6,047,327 ("the '327 patent"), 6,070,067 ("the '067 patent"), 6,119,167 ("the '167 patent"), 6,192,407 ("the '407 patent"), 6,201,974 ("the '974 patent"), 6,333,973 ("the '973 patent"), an article by co-author Luca Deri entitled *Enabling Mobile Network Manager,* an article entitled *Nomadic Access to Information Services by a GSM Phone* ("the NAIS Article"), Japanese Unexamined Application Publication H8-181781, an article entitled *Restaurant Marketing on the World Wide Web*, an article entitled *Robotic Telescopes:  An Interactive Exhibit on the World Wide Web*, an article entitled *Use of Two-Way Wireless Messaging for Personal Telephone Management,* the *Elm Configuration Guide* for the Elm Mail System (ver. 2.5), an article entitled *Rover: A Toolkit for Mobile Information Access* ("*Rover Toolkit*"), an article entitled *Rover Mosaic: E-mail Communication for a Full-Function Web Browser* ("*Rover Mosaic*"), an article entitled *Always On, Always Connected Mobile Computing* ("*Always On*"), the Internet Engineering Task Force Request for Comments 1911:  Voice Profile for Internet Mail ("RFC 1911"), the Internet Engineering Task Force Request for Comments 1487: X.500 Lightweight Directory Access Protocol ("RFC 1487"), and prior art systems including but not limited to the MetaGram Receiver (MR-80), SkyTel pager, the Intel "InfoBytes" system, and RIM Inter@ctive pager 950.  This case is only at the pleading stage, and PNI's investigation of

ANSWER, DEFENSES, FIRST COUNTERCLAIM, AMENDED SECOND COUNTERCLAIM, AND JURY DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

11

1   the prior art is ongoing.  PNI reserves the right to rely upon additional prior art.

2          13.    The patents-in-suit are also either currently undergoing reexamination

3   proceedings, or reexamination has been requested.  During reexamination proceedings HPL has

4   amended the scope of claims of the patents-in-suit, changing the ways in which the prior art

5   cited above is applicable, and making new prior art applicable.  Further modifications of claim

6   scope by HPL during reexamination will make other new prior art applicable.  The invalidity

7   arguments below are therefore necessarily preliminary and subject to supplementation and

8   amendment.

9          14.    HPL is in possession of many of the U.S. patents, foreign patent applications, and

10  printed publications identified in paragraph 12 above, because copies have been provided to

11  HPL in the context of reexamination proceedings before the U.S. Patent and Trademark Office.

12  HPL therefore has specific knowledge of the contents of the prior art identified in paragraph 12

13  above.

14         15.    The constructive invention date of the patents-in-suit is no earlier than September

15  19, 1997.

16         16.    To date, HPL has not alleged in this action an earlier invention date for any of the

17  patents-in-suit.

18         17.    The prior art patents, printed publications, and systems disclose to a person of

19  ordinary skill in the art, including but not limited to several of the prior art references identified

20  in paragraph 12 above, disclose each limitation of the asserted claims of the patents-in-suit,

21  rendering those claims invalid under 35 U.S.C. section 102.

22         18.    Combinations of the prior art, including but not limited to combinations of the

23  prior art identified in paragraph 12 above, disclose each limitation of the asserted claims of the

24  patents-in-suit, rendering those claims invalid under 35 U.S.C. section 103.

25         ***The '716 Patent***

26         19.    For example, and without any limitation, prior art and/or combinations of prior

27  art that render claims 15-18, 21-33, 37-41, 83, 85, 86, 89, 90-92, 94, 97, 99, 100, 103-107, 110,

28  and 112-115 of the '716 patent invalid as anticipated under 35 U.S.C. section 102 and/or

obvious under 35 U.S.C. section 103 include, but are not limited to:

20.     The '415 Patent (to Rossmann) in combination with the *Enabling Mobile Network Managers* Article (Claims 15, 17, 18, 21, 24-27, 83, 92-94, 110, 112 and 113 of the '716 Patent);

21.     The '415 Patent (Rossmann) in combination With the *Enabling Mobile Network Managers* Article and the '973 Patent (Smith) (Claims 16, 84 and 111 of the '716 Patent);

22.     The '415 Patent (Rossmann) in combination With the *Enabling Mobile Network Managers* Article and U.S. Patent No. 5,487,100 ("the '100 Patent") (to Kane) (Claims 22, 23, 90, 91, 114 and 115 of the '716 Patent);

23.     The '415 Patent (Rossmann) in combination With the *Enabling Mobile Network Managers* Article, and JP H8-181781 (to Furuta) (Claims 22, 23, 90, 91, 114 and 115);

24.     The '415 Patent (Rossmann) in combination with the *Enabling Mobile Network Managers* Article and the '616 Patent (to Bjorndahl) (Claims 28-30, 32, 33, 37, 40-42, 85, 86, 89, 95-97, 99, 100 and 103, 104, 107, and 108);

25.     The '415 Patent (Rossmann) in combination With the *Enabling Mobile Network Managers* Article, the '973 Patent (to Smith) and the '616 Patent (Bjorndahl) (Claims 31, 43, 98, and 109);

26.     The '415 Patent (Rossmann) in combination With the *Enabling Mobile Network Managers* Article, the '100 Patent (Kane) and the '616 Patent (Bjorndahl) (Claims 38, 39, 105 and 106 of the '716 Patent);

27.     The '415 Patent (Rossmann) in combination With the *Enabling Mobile Network Managers* Article, JP H8-181781 (Furuta), and the '616 Patent (Bjorndahl) (Claims 38, 39, 105 and 106 of the '716 Patent);

28.     The NAIS Article in combination with the '100 Patent (Kane) (Claims 15, 17, 18, 21, 25-27, 83, 85, 86, 89, 92-94, 110 and 112-115 of the '716 Patent);

29.     The NAIS Article in combination with the '100 Patent (Kane) and JP H8-181781 (Furuta) (Claims 114 and 115 of the '716 Patent);

30.     The NAIS Article in combination With the '100 Patent (Kane) and the '973

1    Patent (Smith) (Claims 16, 84 and 111 of the '716 Patent);

2        31.    The NAIS Article in combination with the '100 Patent (Kane) and the *Enabling*

3    *Mobile Network Managers* Article (Claims 22-24, 90 and 91 of the '716 Patent);

4        32.    The NAIS Article in combination with the *Enabling Mobile Network Managers*

5    Article, the '100 patent, and JP H8-181781 (Furuta) (Claims 22, 23, 90 and 91 of the '716

6    Patent);

7        33.    The NAIS Article in combination with the '100 Patent (Kane) and the '616

8    Patent (Bjorndahl) (Claims 28-30, 32, 33, 38, 41, 42, 95, 96, 97, 99, 100 and 103-108 of the

9    '716 Patent);

10       34.    The NAIS Article in combination with the '100 Patent (Kane), JP H8-181781

11   (Furuta), and the '616 Patent (Bjorndahl) (Claims 38, 39, 105 and 106 of the '716 Patent);

12       35.    The NAIS Article in combination with the '100 Patent (Kane), the '616 Patent

13   and the *Enabling Mobile Network Managers* Article (Bjorndahl) (Claims 37, 39 and 40 of the

14   '716 Patent);

15       36.    The NAIS Article in combination with the '100 Patent (Kane), the '616 Patent

16   (Bjorndahl) and the '973 Patent (Smith) (Claims 31, 43, 98 and 109 of the '716 Patent);

17       37.    The '973 Patent (Smith) in combination with the '100 Patent (Kane) (Claims 15-

18   18, 21-27, 83-86, 89-94, and 110-115 of the '716 Patent);

19       38.    The '973 Patent (Smith) in combination with the '100 Patent (Kane) and JP H8-

20   181781 (Furuta) (Claims 22, 23, 90, 91, 114 and 115 of the '716 Patent);

21       39.    The '973 Patent (Smith) in combination with the '100 Patent (Kane) and the '616

22   Patent (Bjorndahl) (Claims 28-33, 37-43, 95-100, and 103-109 of the '716 Patent); and

23       40.    The '973 Patent in combination with the '100 Patent, JP H8-181781 (Furuta),

24   and the '616 Patent (Bjorndahl) (Claims 38, 39, 105 and 106 of the '716 Patent).

25       41.    Exemplary rationales that may support a conclusion of obviousness include:

26   "(A) Combining prior art elements according to known methods to yield predictable results";

27   and "(D) Applying a known technique to a known device (method or product) ready for

28   improvement to yield predictable results."  M.P.E.P. § 2143, Rationales "A" and "D".

42.     Combinations of prior art that render the asserted claims invalid, including but not limited to the combinations identified in paragraphs 20-40 above) are at most the mere combination of known elements according to a known method to yield predictable results, or the mere application of known techniques to a known system ready for improvement to yield predictable results, rendering the claims invalid under 35 U.S.C. § 103.

43.     The disclosures in the prior art identified above are not cumulative to the technological teachings provided in other cited prior art documents.  The prior art presents the teachings in a new light.

44.     In particular, and without limitation, the prior art presents teachings in the prior art in a new light in view of the Examiner's reasons for confirmation of patentability during the course of prosecution of reexamination Control No. 90/009,880.

45.     The '716 patent pertains to selective paging. According to the '716 patent, a paging system notifies a paging transceiver that a message has been received but does not initially transmit the associated message.  The user, upon being notified of the message, can then download the entire message at a time convenient to the user, which allows the user to download messages at less-expensive off-peak hours and allows the user to place the paging transceiver at a location where it can easily receive the message and reply to the message.  Since the messages are not initially transmitted to the paging transceiver, the paging transceiver can receive and store a greater number of pages with minimal increase in the size of memory.  Further, because entire messages are not automatically transmitted and since the user can position the paging transceiver to issue a sufficiently strong reply, traffic in the paging system can be controlled and actually reduced. '716 patent, 3:3-19.

46.     By way of example, and without limitation, the '415 patent was filed on December 11, 1995.

47.     HPL is in possession of a copy of the '415 patent as a result of reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of the contents of the '415 patent.

48.     The '415 patent qualifies as prior art to the '716 patent under 35 U.S.C. § 102(e).

49.    The '415 patent was submitted to the Examiner in an Information Disclosure Statement during prosecution of the '716 patent.  However, the '415 patent was not cited or applied by the Examiner during prosecution of the application that gave rise to the '716 patent, nor were any teachings of the '415 patent discussed on the record. Accordingly, the portions of the '415 patent discussed below were not relied upon, or otherwise addressed, in a rejection during the original examination of the '716 patent.

50.    The '415 patent was submitted in an earlier *ex parte* reexamination proceeding concerning the '716 patent in an Information Disclosure Statement dated November 2, 2011 ("the November 2d IDS"), along with a petition under 37 C.F.R. § 1.182 to consider the November 2d IDS.

51.    The IDS was filed after an October 25, 2011 Notice of Intent to Issue Reexamination Certificate (or "NIRC").  In a decision dated December 22, 2011, the petition was dismissed, denying entry of the November 2d IDS for consideration by the Examiner.

52.    None of the documents cited in the November 2d IDS, including the '415 patent and the patentee's comments regarding this patent, was considered on the record during the *ex parte* reexamination proceeding.

53.    Figure 1 of the '415 patent illustrates one embodiment of the invention that includes the two-way data communication devices.  In Figure 1, the cellular telephone user must address, i.e., connect to, each computer of interest to access the different services. Consequently, each computer requires the information necessary to communicate with cellular telephone 100 with display 105.  In another embodiment, cellular telephone 100 contacts a single central computer over data capable cellular telephone network 110.  This computer is connected to each of the other networks illustrated in Figure 1.

54.    Consequently, the use of cellular telephone 100 sends a message including a resource locator to the central computer, the central computer processes the message and retrieves the information addressed by the resource locator from the appropriate network shown in Figure 1. After the requested information is retrieved, the central computer generates a card deck and transmits the card deck to cellular telephone 100. In this embodiment, only one

1  computer must be configured to communicate with cellular telephone 100. '415 patent, 19:1-19.

2      55.     The client process on a two-way data communication device can initiate an

3  interaction with a particular server computer. The server computer transmits (i) information to

4  the client process to generate a user interface, and (ii) a resource locator for each possible

5  selection by the user from the user interface. The resource locators can address applications on

6  the server computer, applications on over server computers, or an application on the server

7  computer that in turn accesses other server computers. Consequently, the user of a two-way data

8  communication device is limited only by the applications provided on the server computers.

9  '415 patent, 19:20-41.

10      56.     Network 150 is a two-way data communication network that interconnects any

11  one, any combination, or all of two-way data communication devices 100, 101, or 102, with a

12  wide variety of computer networks 120, 130, and 140. Each two-way data communication

13  device 100, 101, and 102 can be configured to transmit data to and receive data from any

14  desired combination of computers on computer networks 120, 130, and 140. '415 patent, 7:57 -

15  8:3.

16      57.     Each wireless communication device 100 can communicate over network 150

17  with any server computer 121, 131, and 141 on network 150. Thus, device 100 can access

18  information on the computer network and provide information to the computer network.

19  Similarly, a two-way pager 101, and a telephone 102 with a modem 103, can communicate over

20  network 150 with any of server computers 121, 131, and 141. '415 patent, 8:4-17.

21      58.     Specifically, a wireless communication device 100 e.g., a cellular telephone, with

22  a telephone like keypad, communicates via a data capable cellular telephone network 110, e.g., a

23  cellular digital packet data telephone network, with an application on a server computer on a

24  computer network that has an interface to data capable cellular telephone network 110. For

25  example, the computer network can be a corporate wide area network 120, a corporate local area

26  network 130, or perhaps the Internet 140. '415 patent, 8:37-45.

27      59.     Similarly, a two-way pager 101 communicates via a two-way pager network 111

28  with an application on a server computer on a computer network that has an interface to two-

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

17

1  way pager network 111. Again, for example, the computer network can be a corporate wide area

2  network 120, a corporate local area network 130, or perhaps the Internet 140. Finally, a

3  telephone 102 communicates via a modem 103 and public switched telephone network 112 with

4  an application on a server computer on a computer network that has an interface to public

5  switched telephone network 112. As with the other two-way data communication devices, the

6  computer network can be, for example, a corporate wide area network 120, a corporate local

7  area network 130, or perhaps the Internet 140. '415 patent, 8:46-59.

8        60.    If initially, two-way pager 101 receives a response to a message from an

9  application on server computer 121 on corporate wide area network 120, the interpreter in two-

10 way pager 101 generates a user interface on display screen 106 using information in the

11 message. Options presented in the user interface can allow the user to access information, or

12 provide information to any one, any combination of, or all of networks 120, 130, and 140. '415

13 patent, 10:14-23.

14       61.    The '415 patent discloses that the cellular telephone transmits a request for

15 content from the cellular telephone to the identified content's location:  "In another example, the

16 user of cellular telephone 100 connects to Internet service provider computer 141 on Internet

17 140 using data capable cellular telephone network 110. Upon connection of cellular telephone

18 100, service provider 141 transmits to cellular telephone 100 a card deck to generate FIGS. 4A

19 to 4C." '415 patent, 17:50-55.  . . . "In this example, the user depresses the three key on the

20 ke[y]pad of cellular telephone 100 to select the stock quotes and item three in screen display

21 402 is highlighted.  In response to this selection, <u>cellular telephone 100 transmits a request</u> for a

22 stock quote, i.e, a message including a resource locator, over cellular telephone network 100 and

23 internet 140 <u>to service provider 141</u>. In response to the request, service provider computer 141

24 executes the application addressed by the resource locator. The application retrieves a card deck

25 that, in turn is transmitted to cellular telephone 100. The card deck includes a display card and

26 an entry card." '415 patent, 18:8-18 (underline emphasis added).

27       62.    The NAIS (Nomadic Access to Information Services by a GSM Phone) Article

28 was published in 1996.

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

18

1   63.   The NAIS Article qualifies as prior art to the '716 patent under 35 U.S.C. §
2   102(a).

3   64.   The NAIS Article was not considered by the Examiner during prosecution of the
4   application that gave rise to the '716 patent.

5   65.   HPL is in possession of a copy of the NAIS Article as a result of reexamination
6   proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of
7   the contents of the NAIS Article.

8   66.   The NAIS Article was submitted in the *ex parte* reexamination proceedings in
9   the November 2d IDS.  As the petition to consider the November 2d IDS was denied, none of
10  the documents cited in the November 2d IDS, including the NAIS Article and the patentee's
11  comments regarding this article, was considered on the record during the *ex parte* reexamination
12  proceedings.

13  67.   The NAIS system is depicted in Figure 1 of the NAIS Article.

14  68.   The system disclosed in the NAIS Article consists of user terminals, which are
15  GSM mobile phones equipped with short message send and receive functionality, and a NAIS
16  server, which is a GSM phone with a GSM data card connected to the computer. The server can
17  also be implemented with a direct network access to SMSC (short message service center). In
18  this case, the server does not need a GSM phone with the data card to establish the connection.
19  The NAIS server also contains a voice/fax/data modem, which can be used to record and send
20  voice messages and to send fax messages. NAIS Article at 652.

21  69.   The communication between the user terminals and the server is made using
22  SMS. The user has a predefined command set, which can be used to execute different
23  applications in the NAIS server. These applications are normally information queries updates.
24  The possible results of the executions can be sent back to the user using SMS, fax or making a
25  voice call. NAIS Article at 652.

26  70.   One application for the NAIS system is to provide remote access to the user's e-
27  mail. When traveling, it is useful to be able to receive and send e-mail messages. However, it is
28  not always convenient to carry a notebook PC with a modem everywhere. The NAIS system can

be used to provide e-mail access services for the GSM phone user. NAIS Article at 653.

71.    The purpose of the alerting service is to notify the mobile user of incoming mail. When the user receives a new e-mail, the NAIS system generates a new SMS message and sends it to the user's GSM phone. The message contains the sender and subject fields of the e-mail message. The user can also specify which kinds of e-mails cause alerting and thereby eliminate unnecessary alerting. Alerting is a typical pager service. Use of GSM SMS eliminates the need for an additional pager. NAIS Article at 653.

72.    The mail list service allows a user to get a list of incoming mails. This list contains the sender and subject fields of e-mails. The NAIS system attaches a message ID to each e-mail list item, so that the ID can be used to retrieve the message itself. It is also possible to list the contents of another mail folder with the mail list service. NAIS Article at 653.

73.    With the message retrieval service a user can retrieve his e-mail messages. This may be done in several ways as described below. Figure 2 illustrates an example of how an incoming SMS message is processed for the email message retrieval.  The incoming message sender is first authenticated by checking valid users from the user database. Mail handling application is then started as specified in the user's profile.  Special media conversion utilities are used to convert MIME multimedia mail body parts to the transfer media. NAIS Article at 654.

74.    Audio mail messages and audio MIME bodyparts can be retrieved using a voice modem. Also textparts can be converted into audio using a speech synthesizer. Almost everything printable can be converted to fax format and can be retrieved using a fax modem. This includes text and pictures in several formats. Short mail messages in text format can be retrieved using SMS. Mail messages or bodyparts longer than 160 characters are split into several SMS messages. The conversion mechanism converts only those MIME bodyparts which are meaningful for the transfer media (voice, fax, SMS). NAIS Article at 654.

75.    Independent claim 15 of the '716 patent was amended to recite "a memory controller including a processor coupled to the memory configured to cause a <u>paging</u> data signal to be directed to a cell phone… wherein the memory controller is configured to direct the

content corresponding to the content identifier from the memory to the cell phone only upon receiving a request from the cell phone <u>at the identified content's location</u> to do so."

76. Independent claim 30 of the '716 patent was amended to recite "causing a <u>paging data signal to be directed to a cell phone</u>… transmitting the available content corresponding to the content identifier to the cell phone upon receiving a request <u>at the identified content's location</u> to do so."

77. The Examiner of the '716 patent indicated that these were the features that distinguished claims 15 and 30 over the prior art. *See* IFW of Reexamination Control No. 90/009,880, NIRC, pg. 7. Newly added independent claims 83, 97 and 110 recite the same or substantially same limitations.

78. The NAIS Article discloses this feature, among others. For example, the NAIS Article discloses transmitting the content corresponding to the content identifier upon receiving a request at the identified content's location to do so - an incoming SMS message is processed for the email message retrieval.

79. The NAIS Article discloses:  "The mail list service allows a user to get a list of incoming mails. This list contains the sender and subject fields of e-mails. The NAIS system attaches a message ID to each e-mail list item, so that the ID can be used to retrieve the message itself using another service described in later chapters. It is also possible to list the contents of another mail folder with this service. The list can also be sent to a fax machine instead of using GSM SMS." NAIS Article at 653.

80. The NAIS Article further discloses:  "4.1.4. *Message retrieval service.* With the message retrieval service a user can retrieve his e-mail messages. This may be done in several ways as described below. Figure 2 illustrates an example of how an incoming SMS message is processed for the email message retrieval. The incoming message sender is first authenticated by checking valid users from the user database. Mail handling application is then started as specified in the user's profile. Special media conversion utilities are used to convert MIME [citation omitted] multimedia mail bodyparts to the transfer media. Audio mail messages and audio MIME bodyparts can be retrieved using a voice modem. Also textparts can be converted

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

21

into audio using a speech synthesizer. Almost everything printable can be converted to fax format and can be retrieved using a fax modem. This includes text and pictures in several formats. Short mail messages in text format can be retrieved using SMS. Mail messages or bodyparts longer than 160 characters are split into several SMS messages. The conversion mechanism converts only those MIME bodyparts which are meaningful for the transfer media (voice, fax, SMS). There is no way to convert an attached audio message to fax format or a graphics drawing to audio message though." NAIS Article at 654.

81.     The '973 patent (to Smith) entitled "Systems and Methods for Enabling a User of a Communication Device to Manage Remote Information" issued on December 25, 2001, from an application filed on April 23, 1997.

82.     As such, the '973 patent qualifies as prior art to the '716 patent under 35 U.S.C. § 102(e).

83.     The '973 patent was not considered by the Examiner during prosecution of the application that gave rise to the '716 patent, nor by the Examiner during the *ex parte* reexamination proceeding or the denied *inter partes* reexamination.

84.     HPL is in possession of a copy of the '973 patent as a result of reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of the contents of the '973 patent.

85.     Figure 1 of the '973 patent shows a diagram of a communication network disclosed and claimed by the '973 patent.

86.     An integrated message center is a logical entity that resides in mobile telephone 1100 and operates in conjunction with network services provider 1200 to inform a user of incoming and pending messages, such as fax mail, e-mail, voice mail, etc. The integrated message center also serves as a mechanism by which the user can retrieve, manipulate, and reply to all types of messages. User manipulation of the pending messages might include the ability to view, prioritize, edit, playback, discard, and/or forward messages.  '973 patent, 3:50-59.

87.     In the system disclosed in the '973 patent, the user uses mobile telephone 1100 to

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

22

1   view messages from callers having different types of caller equipment. '973 patent, 3:60-61.

2   The callers leave different types of messages for the user, depending upon the type of caller

3   equipment. '973 patent, 3:65-67.

4          88.     Network services provider 1200 stores many of the messages awaiting retrieval

5   by the user and notifies the user of the pending messages. Subscriber mobile telephone 1100 and

6   caller equipment 1300 through 1700 communicate with network services provider 1200 over a

7   communications network, such as Global System for Mobile Communications (GSM) switching

8   fabric 1800. '973 patent, 4:1-7.

9          89.     When the caller uses computer 1600 to send an e-mail message to the user, the

10  caller enters the message into the computer and affixes the user's e-mail address. The user's e-

11  mail address directs the e-mail message to network services provider 1200. Network services

12  provider 1200 stores the e-mail message, and then sends a short message to mobile telephone

13  1100, notifying the user of the pending e-mail message. '973 patent, 4:57-64.

14         90.     FIG. 5 of the '973 patent is a block diagram of the elements of network services

15  provider 1200, including interface 5100, transcoder and rate adapter unit (TRAU) 5200, SMS

16  server 5300, interworking function (IWF) servers 5400 and 5500, voice mail server 5600, fax 5

17  mail server 5700, e-mail server 5800, and backup 5900. Interface 5100 interfaces the elements

18  of network services provider 1200 to GSM switching fabric 1800. '973 patent, 7:1-8.

19         91.     The e-mail server 5800 processes and stores e-mail messages, and informs SMS

20  server 5300 of the pending message and the identity of the caller. SMS server 5300, in turn,

21  notifies the user of the pending message via an SMS e-mail notification message. The SMS

22  notification message might include the sender's name, telephone number, and e-mail address, a

23  time and date stamp, and the name and address of e-mail server 5800. Backup 5900 serves as a

24  backup memory device that stores pending messages in the event of a failure in one of the

25  servers. '973 patent, 8:1-10.

26         92.     When the user wants to retrieve the e-mail message after viewing the e-mail

27  notification message, the user first selects the e-mail icon corresponding to the e-mail message

28  from the message center display (FIGS. 7A and 7B), and then instructs mobile telephone 1100

to retrieve the e-mail message by pressing the "View" button. In response, mobile telephone 1100 establishes a connection with network services provider 1200 to download the e-mail message from e-mail server 5800. '973 patent, 10:48-56.

93.     The system disclosed by the '973 patent works for many types of messages including fax mail, e-mail, voice mail, etc. 3:53-54. One particular type of message is a web page. Figures 9A and 9B provide a detailed example of sending an SMS message the includes HTML code such as a hot-link to a web page.

94.     FIGS. 9A and 9B are examples of screen displays for SMS text messages with hypertext markup language (HTML) code. The HTML code permits the caller to insert selection buttons or hot-links into the text message. FIG. 9A is an example of a screen display for a text message that includes two selection buttons. To respond to the text message, the user can simply press the "Yes" or "No" button. FIG. 9B is an example of screen display of a text message that includes a hot-link. By pressing the "TravelNorth" hot-link, mobile telephone 1100 establishes a telephone connection to the TravelNorth company or accesses their web page. '973 patent, 9:23-35.

95.     The '973 patent also discloses executing a command sent from a cell phone, that is performed on the content prior to the system directing the content to the cell phone. The command includes at least one of deleting the content, forwarding the content to a specified recipient, saving the content, or replying to the content. For example the '973 patent discloses that message center 6100 permits the user to view the fax notification message, select and view the contents or a portion of the contents of the fax, forward the fax to facsimile equipment, a printer, or a computer, delete the fax, and change the password to fax mail server 5700. '973 patent, 10:11-17.

96.     When the user wants to retrieve the fax after viewing the fax notification message, the user first selects the fax icon corresponding to the fax from the message center display (FIGS. 7A and 7B), and then instructs mobile telephone 1100 to retrieve the fax by pressing the "View" button. In response, mobile telephone 1100 establishes a B-channel connection with network services provider 1200 to download the fax from fax mail server 5700.

Display 2400 only displays a portion of the downloaded fax at a time due to display 2400's limited size. Mobile telephone 1100 provides on-screen graphical scroll keys, or hard keys on main housing 2100, to allow the user to scroll horizontally and vertically to view the entire fax. '973 patent, 10:18-29.

97.     When the user wants to forward the fax after viewing the fax notification message, the user first selects the fax icon from the message center display, and then presses the graphical button corresponding to the destination location. In response, mobile telephone 1100 establishes a connection with network services provider 1200 and informs fax mail server 5700 where to forward the fax. '973 patent, 10:30-37.

98.     The '100 patent (to Kane) issued on January 23, 1996.

99.     The '100 patent qualifies as prior art for the '716 patent under 35 U.S.C. § 102(b).

100.    The '100 patent is cited on the face of the '716 patent, but was not considered by the Examiner or discussed on the record during prosecution of the '716 patent, nor by the Examiner during the *ex parte* reexamination proceeding or the denied *inter partes* reexamination.

101.    HPL is in possession of a copy of the '100 patent as a result of reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of the contents of the '100 patent.

102.    Figure 1 shows a communication system 100 utilizing a paging transmitter system 120, 122, 124, 126, for delivering messages to at least one portable remote unit, such as a portable selective call receiver 130. A central terminal 102 includes input sections 110, 112 for receiving inputs from a number of different devices 104, 106, 108, including receiving page requests for initiating pages that are transmitted by the paging transmitter system 120, 122, 124, 126, to the at least one portable remote unit 130. The central terminal 102 has input sections 110 that interface with the telephone company equipment, such as the public switched telephone network (PSTN) 107. Personal computers or other computing devices 104 can access the input sections 110 through the PSTN using a dial-up telephone line and modem communication.

1   Typically, these input devices 104, 106, can remotely initiate page requests through the central

2   terminal 102 by calling up the input sections 110 of the central terminal 102 over dial-up

3   telephone lines of the PSTN 107. *See* '100 patent, 2:58 - 3:12.

4         103.    Alternatively, other input sections 112 of the central terminal 102 can receive

5   inputs, such as page requests, from local computing interfaces 108, such as for interfacing with

6   a local personal computer, a console, or other terminal device. Also, an interface 109 to an

7   X.400 network 113 can handle message delivery between the input sections 112 of the central

8   terminal 102 and one or more originating devices on the X.400 network 113. *See* '100 patent,

9   3:13-24.

10         104.    The input sections 110, 112, communicate page requests to a controller 114

11   through a communication bus 116. The controller 114 may include controller circuitry and

12   associated memory such that an incoming page request may be accepted and stored into

13   available memory for subsequent transmission to one or more selective call receivers 130. *See*

14   '100 patent, 3:25-30.

15         105.    A non-volatile memory device 118, such as battery backed up RAM, one or more

16   disc drive units, or other non-volatile storage medium, is utilized by the controller 114 for

17   longer term storage of messages destined for the one or more selective call receivers 130. The

18   controller 114 typically couples the message information and other associated information to the

19   memory device 118 via the bus 116. The message information, which can include numeric,

20   alphanumeric, or binary information, and other associated information, is stored in the memory

21   118 and can be used by the controller 114 for keeping track of the messages being delivered to

22   the remote units 130. The message information can also be used by the controller 114 to provide

23   a means through the central terminal 102 for delivering reply messages from the remote units

24   130 back to one or more X.400 originating devices on the X.400 network 113. *See* '100 patent,

25   3:31-48.

26         106.    Additionally, a timing module 128 provides time information to the controller

27   114. The time information, e.g., date and time of day information, can be utilized for keeping

28   track of messages being processed by the central terminal 102, for communicating time

1    information along with the delivered messages to the selective call receivers 130, and for other

2    system administrative and maintenance functions for the central terminal 102. This time

3    information can also be used to facilitate X.400 message addressing and delivery between the

4    X.400 network 113 and the remote units 130, as will be more fully discussed below. *See* '100

5    patent, 3:49-59.

6    107.    The controller 114 couples messages to the paging encoder 120 over the bus 116

7    for encoding the messages for transmission over a paging channel. The paging encoder 120 then

8    couples the encoded messages over a communication path 122 to one or more paging

9    transmitter systems 124, 126, for transmission over a paging communication channel. The

10   communication path 122, in this example, routes the messages from the central terminal 102 to a

11   paging transmitter system 124, 126, and over a paging communication channel for reception by

12   the one or more selective call receivers 130. *See* '100 patent, 3:60 - 4:9.

13   108.    The selective call receiver 130 preferably incorporates a paging receiver 134 that

14   operates to receive messages transmitted over the paging communication channel through the

15   antenna 132. *See* '100 patent, 4:10-18.

16   109.    The paging receiver 134 couples a received message to the controller 136

17   through the bus 138. The controller 136 operates to decode the received message and match

18   address information in the received message to a predetermined address in the selective call

19   receiver 130. In this way, the controller 136 can determine whether the received message is

20   intended for the particular selective call receiver 130. Further, a memory 140 is coupled to the

21   paging receiver 134 and the controller 136 through the bus 138 for storing the received message

22   in the memory 140. A user can access user input means 141, such as buttons or switches, at the

23   remote unit 130 to cause the message data of a received message to be displayed on a display,

24   e.g., a liquid crystal display (not shown). The user can then read the message that is visible on

25   the display. User input at the remote unit 130 can also cause the remote unit 130 to perform

26   other functions known to users of selective call receivers and portable personal computing

27   devices. *See* '100 patent, 4:19-36.

28   110.    A real time clock 142 is also coupled through the bus 138 to the controller 136

1  for providing time information thereto. The remote unit 130 is then capable of providing time

2  information to the user as part of displaying information on the display (not shown).

3  Additionally, the controller 136 can utilize the time information provided by the real time clock

4  142 for other useful operations in the selective call receiver 130.

5      111.    FIG. 2 of the '100 patent shows a message database 202 in the central terminal

6  memory 118 for keeping track of X.400 electronic mail messages delivered through the central

7  terminal 102 and for allowing reply messages from the remote units 130 through the central

8  terminal 102 and back to the originating device through the X.400 network 113. The message

9  database 202 is maintained for each subscriber identified by a subscriber address in the

10 communication system 100. The subscriber address is typically located in a subscriber database

11 (not shown) in the terminal memory 118 for sending messages to the remote units 130. On the

12 other hand, the message database 202 allows the central terminal 102 to keep track of the X.400

13 messages being sent to the remote units 130 while allowing the central terminal 102 to service

14 reply message requests from the remote units and destined for the originating device in the

15 X.400 network 113. '100 patent, 5:23-39.

16     112.    When the controller 114 determines that an X.400 message is requested to be

17 sent to one or more remote units 130 from an X.400 originating device, the controller 114 stores

18 a copy of the X.400 message intact in the central terminal memory 118. A message record 204

19 is stored in the message database 202 including a message I.D. field 208 and a time tag field 210

20 for identifying the message record 204 in the message database 202. The X.400 message

21 information, such as the originator's I.D. 212, the message body 214, and other associated

22 X.400 information 216 are also stored in the message record 204 in the message database 202.

23 Similarly, as other messages are received by the central 102 additional message records 206 are

24 created in the message database 202 for keeping track of those messages being processed

25 through the communication system 100. '100 patent, 5:40-54.

26     113.    Preferably, the message I.D. 208 is a short string of characters, which can

27 identify the originator of the X.400 message from the X.400 network 113. For example, the

28 message I.D. 208 can comprise the surname (SN) information from the X.400 message which

1  identifies the originating device of the X.400 message. Further, the controller 114 accesses the

2  timing module 128 to get timing information which the controller 114 then adds to the message

3  record 204 as part of a time tag field 210. The combination of the message I.D. 208 and the time

4  tag 210 identify the originator of the message and the specific occurrence of the message, e.g.,

5  the time of occurrence, through the central terminal 102. Hence, if multiple messages originate

6  from the same originating device, they are distinguishable from each other due to the time tag

7  field 210. In this way, the central terminal 102 can keep track of the X.400 messages that it

8  services. Additionally, the central terminal 102 sends along with the transmitted message the

9  message I.D. information 208, and the time tag information 210 for identifying the message to

10  the destination remote unit 130.

11      114.    The message I.D. information 208 and the time tag information 210 require

12  typically about 20 characters to be transmitted with the message over the paging communication

13  channel. According to the '100 patent, this is much more efficient than transmitting the original

14  X.400 address information which can require upwards of 400 characters to identify the X.400

15  address for the X.400 network 113. Therefore the paging communication channel bandwidth is

16  more efficiently utilized by the communication system 100 in delivering the electronic mail

17  messages to the remote units 130. '100 patent, 5:55 - 6:17.

18      115.    The NIRC in the *ex parte* reexamination proceeding confirms the patentability of

19  claims 2, 22, 38, 48, and 52, stating that the claims require that the notification indicate a time

20  the <u>content</u> itself -- and not an identifier of the content, such as the Info Bite disclosed in the Tso

21  patent -- is available.

22      116.    The '100 patent discloses this feature, among others. For example, the '100

23  patent discloses a notification that specifies a time that <u>the content</u> that is the subject of the

24  notification is available - the notification sent to remote unit 130 includes time tag 210, that is,

25  the time of occurrence of the message to be sent to remote unit 130: "Preferably, the message

26  I.D. 208 is a short string of characters, which can identify the originator of the X.400 message

27  from the X.400 network 113. For example, the message I.D. 208 can comprise the surname

28  (SN) information from the X.400 message which identifies the originating device of the X.400

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

29

message. Further, the controller 114 accesses the timing module 128 to get timing information which the controller 114 then adds to the message record 204 as part of a time tag field 210. The combination of the message I.D. 208 and the time tag 210 identify the originator of the message and the specific occurrence of the message, e.g., the time of occurrence, through the central terminal 102. Hence, if multiple messages originate from the same originating device, they are distinguishable from each other due to the time tag field 210. In this way, the central terminal 102 can keep track of the X.400 messages that it services. Additionally, the central terminal 102 sends along with the transmitted message the message I.D. information 208, and the time tag information 210 for identifying the message to the destination remote unit 130. The message I.D. information 208 and the time tag information 210 require typically about 20 characters to be transmitted with the message over the paging communication channel. This is much more efficient than transmitting the original X.400 address information which can require upwards of 400 characters to identify the X.400 address for the X.400 network 113. Therefore the paging communication channel bandwidth is more efficiently utilized by the communication system 100 in delivering the electronic mail messages to the remote units 130." '100 patent, 5:55 - 6:17 (emphasis added).

117.    Japanese Unexamined Patent Application Publication H8-181781 (Furuta) published on July 12, 1996.

118.    The Furuta publication qualifies as prior art for the '716 patent under 35 U.S.C. § 102(b).

119.    The Furuta publication was not of record during the original prosecution of the '716 patent, and as such was not considered by the Examiner or discussed on the record during prosecution of the '716 patent.

120.    HPL is in possession of a copy of the Furuta publication as a result of reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of the contents of the Furuta publication.

121.    The Furuta publication was not considered by the Examiner during the *ex parte* reexamination proceeding or the denied *inter partes* reexamination of the '716 patent.

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

30

122.    The Furuta publication discloses a system (*e.g.*, service management station 2) that transmits a notification (*e.g.*, a voicemail notification transmission) that specifies a time (*e.g.*, a time (reception date and time) that indicates a time period (retention period)) that the content (*e.g.,* voicemail) is available at the service management station.

123.    More particularly, Furuta discloses that when a new voicemail message is received at the service management station 2, the service management station transmits a reception notification message to a Personal Handy Phone System (PHS) terminal 6.  The service management station transmits the reception time and date and the caller telephone number with the reception notification that is sent to the PHS terminal 6.  Using the transmitted information, the PHS terminal 6 monitors the retention period expiration date of the voicemail messages that are stored on the service management station.  If the PHS terminal does not transmit a message extending the expiration date, the service management station deletes the message.  *See, e.g.*, Furuta ¶¶ 4, 5, 9, 38 and 45.

124.    In Figure 1 of the Furuta publication (which is a block diagram), "1" is a network management station which connects to each radio base station and manages communication between the base stations and the PHS by controlling a telephone line network 4. Symbol 2 is a service management station which stores voicemails and various types of data in a database 3 and provides various services to supply the voicemails or data to users in response to requests from a PHS terminal 6 described below. In response to requests from the PHS terminal, the service management station 2 provides various voicemail services such as establishing an area (mailbox) for storing voicemails (audio data) in the database, storing the voicemails, and transmitting them to users. The network management station 1 and the service management station 2 may also be a single station.  *See* Furuta Publication ¶ 13.

125.    Furuta discloses that the PHS terminal 6 retains "the reception date and time of a voicemail and the caller telephone number, which is transmitted automatically from the service management station 2 each time a voicemail is stored in the mailbox." Furuta ¶ 38 (emphasis added.)  Furuta also discloses that it is possible to confirm information related to the voicemail, such as whether it has reached the retention expiration date, as shown in Figure 13 below.

ANSWER, DEFENSES, FIRST COUNTERCLAIM, AMENDED SECOND COUNTERCLAIM, AND JURY DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

31

Furuta ¶ 38 (emphasis added.)

126. In addition, Furuta discloses a retention period, which is the time period from the reception date and time to the retention expiration date. At the end of the retention period, the service management station 2 deletes the voicemail unless the user indicates that the message should be retained. Furuta ¶ 41; *see also*, Figure 13 below. The PHS terminal 6 determines whether a voicemail has reached the retention expiration date using the information transmitted with the notification message. *See, e.g.*, Furuta ¶ 38, claims 1 & 3.

127. Accordingly, when the PHS terminal 6 receives the reception date and time of a voicemail, as disclosed, for example, in ¶ 38 of Furuta, the PHS terminal 6 also knows the time that the content (voicemail) is available because the PHS terminal also knows when the voicemail will be deleted (*i.e.*, the retention expiration date as disclosed in Furuta ¶ 38, and Figure 13 below). Therefore, the reception notification message sent from the service management station to the PHS terminal specifies a time (reception date and time) that indicates a time period (retention period) during which the content (voicemail) is available at the service management station.

128. PNI is informed and believes, and thereupon alleges, that the *Enabling Mobile Network Managers* article was orally presented and publicly disseminated during the Sixth International World Wide Web Conference, which was held April 7-11, 1997 in Santa Clara, California, at the Santa Clara Convention Center.

129. PNI is informed and believes, and thereupon alleges, that the conference was an open forum, open to all persons interested in the subject matter. Deri Declaration, ¶ 6.

130. PNI is informed and believes, and thereupon alleges, that the *Enabling Mobile Network Managers* paper was orally presented between April 7-11, 1997, and was included on compact discs that were disseminated without restriction to Conference attendees from April 7-11, 1997. Deri Declaration, ¶¶ 8-9.

131. PNI is informed and believes, and thereupon alleges, that the *Enabling Mobile Network Managers* paper as presented and disseminated at the Word Wide Web Conference April 7-11, 1997 constitutes a printed publication.

132.   HPL is in possession of a copy of the *Enabling Mobile Network Managers* paper as a result of reexamination proceedings pending before the U.S. Patent and Trademark Office. It has specific knowledge of the contents of the *Enabling Mobile Network Managers* paper.

133.   HPL also is in possession of a declaration by one of the authors of the *Enabling Mobile Network Managers* paper as a result of reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of the contents of that declaration.

134.   PNI is informed and believes, and thereupon alleges, that the *Enabling Mobile Network Managers* paper is prior art to the '716 patent under 35 U.S.C. § 102(a).  M.P.E.P. § 2128.01 II (paper which is orally presented in a forum open to all interested person constitutes a "printed publication" if written copies are disseminated without restriction; *citing Massachusetts Institute of Technology v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985) (paper orally presented to between 50 and 500 persons at a scientific meeting open to all persons interested in the subject matter, with written copies distributed without restriction to all who requested, is a printed publication)).

135.   PNI is informed and believes, and thereupon alleges, that the *Enabling Mobile Network Managers* paper was also published in paper conference proceedings by Elsevier Science B.V. in the journal Computer Networks and ISDN Systems, Volume 29, Issues 8-13, September 1997, pages 1417-1428.

136.   The *Enabling Mobile Network Managers* article discloses that a URL can be sent to a cellular phone of a user. This allows the user to choose whether or not to download further information, and when to do so. *See*, *Enabling Mobile Network Managers* article, pg. 7. The user can utilize the URL to obtain additional information. *Id*.

137.   The *Enabling Mobile Network Managers* article discloses providing a URL that allows a request signal to be sent from a "cell phone *to the identified content's location* so that the desired content may be downloaded to the phone," as recited, for example, in claim 1 of the '716 patent, as amended during *ex parte* reexamination.

138.   Independent claim 15 of the '716 patent was amended during *ex parte* reexamination to recite "a memory controller including a processor coupled to the memory

1 configured to cause a *paging* data signal to be directed to a cell phone… wherein the memory

2 controller is configured to direct the content corresponding to the content identifier from the

3 memory to the cell phone only upon receiving a request from the cell phone *at the identified*

4 *content's location,* to do so."

5       139.   Independent claim 30 of the '716 patent was amended to recite "causing a *paging*

6 data signal to be directed to a cell phone… transmitting the available content corresponding to

7 the content identifier to the cell phone upon receiving a request *at the identified content's*

8 *location*, to do so."

9       140.   Newly added independent claims 83, 97 and 110 recite the same or substantially

10 same limitations.

11       141.   The *Enabling Mobile Network Managers* article discloses this feature, among

12 others. For example, the *Enabling Mobile Network Managers* article discloses that with SMS

13 messages, instructions can be included where to get more information - a URL to connect to

14 with a web browser.

15       142.   Figure 3.4 of the *Enabling Mobile Network Managers* article shows URLs for

16 multiple subordinate Management Objects (MOs), such as: "atmAccessPoint=pString

17 "atmNAP1")"; "atmAccessPoint=pString "atmNAP1")"; "atmAccessPoint=pString

18 "atmNAP1")".

19       143.   PNI is informed and believes, and thereupon alleges, that a person of ordinary

20 skill in the art knows that the URLs disclosed in the article would have been clicked on (or

21 otherwise activated) by a user to direct content corresponding to the content identifier from the

22 memory to the cell phone only upon receiving a request from the cell phone at the identified

23 content's location, to do so.  In other words, a request for the content is being sent from the cell

24 phone to the identified content's location.

25       144.   The '616 patent issued on April 1, 1995. The '616 patent qualifies as prior art for

26 the '716 patent under 35 U.S.C. § 102(b).

27       145.   The '616 patent was not considered by the Examiner during prosecution of the

28 '716 patent.

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

34

146.    HPL is in possession of a copy of the '616 patent as a result of reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of the contents of the '616 patent.

147.    As with the '415 patent discussed above, the '616 patent was submitted in the *ex parte* reexamination proceedings in the November 2d IDS.  As the petition to consider the November 2d IDS was denied, none of the documents cited in the November 2d IDS, including the '616 patent and the patentee's comments regarding this patent, was considered on the record during the *ex parte* reexamination proceedings.

148.    The '616 patent provides for automatic callback in a cellular mobile telecommunication network even in cases in which a calling subscriber and/or a called subscriber has/have traveled a long distance in the network from the time of initiating the callback service to the time at which the service is carried out. The '616 patent stores the location identity characters of the two (calling and called) subscribers in an existing central database in the mobile telecommunication network.

149.    The central database, which is known as the home location register (HLR), maintains a record of the whereabouts in the network of all mobile units that are registered in the system and are located in the network at that moment in time. This is made possible by connecting the HLR to all local databases, known as visitor location registers (VLRs), in which there is stored a traffic area code which discloses the geographic positions of the mobile units at each moment in time.

150.    The '616 patent provides the ability of the HLR to know in which VLR(s) all mobile units are registered. This enables calls to be connected even when the subscribers have moved from a first VLR to a second VLR in the time lapse between initiating callback and executing callback. See '616 patent, 2:1-35.

151.    The '415 patent in combination with the *Enabling Mobile Network Managers* article renders obvious claims 15, 17, 18, 21, 24-27, 83, 92-94, 110, 112 and 113 of the '716 patent.

152.    Claims 17, 18, 21, and 24-27 of the '716 patent depend from independent claim

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

35

1   15, claims 92-94 depend from independent claim 83, and claims 112 and 113 depend from

2   independent claim 110.

3       153.   The '415 patent in combination with the *Enabling Mobile Network Managers*

4   article teaches all of the limitations of the claims listed above.

5       154.   The combination of the '415 patent and the *Enabling Mobile Network Managers*

6   article was not cited or discussed in the prosecution history of the '716 patent, or during the

7   course of the respective proceedings of Reexamination Control Nos. 90/009,880 and

8   95/001,738.

9       155.   During the course of prosecution of the Reexamination Control No. 90/009,880

10  proceeding, the Examiner considered U.S. Patent No. 6,047,327 ("Tso").  In order to distinguish

11  over Tso, the patentee amended the original independent claims of the '716 patent to require

12  sending a request signal to the content's location.

13      156.   For example, claim 1 was amended to require sending a request signal from the

14  cell phone to the identified content's location.  The limitation "to the identified content's

15  location" was added to Claim 1.

16      157.   The limitation "at the identified content's location" was added to claims 15, 30,

17  and 44.

18      158.   The limitation "to the identified address of the remote content storage system"

19  was added to Claim 51.  *See* Supplemental Request for Reconsideration after Final Office

20  Action Pursuant to 37 C.F.R. §§ 1.116 and 1.530 filed October 13, 2011.

21      159.   The examiner allowed these amended claims over Tso because, according to the

22  Examiner, Tso does not use the resource identifier to send a request signal to the identified

23  content's location. Instead, Tso discloses that the request signal is directed to the InfoCast

24  Server (a server which does not contain content) and that the request signal is allegedly not

25  transmitted to the content's locations (for example, a server that includes (or stores) content).

26  *See*, IFW of Reexamination Control No. 90/009,880, NIRC, pg. 6.

27      160.   The '415 patent in combination with the *Enabling Mobile Network Managers*

28  Article discloses a system wherein the cell phone sends a request signal to the identified

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

36

content's location, without the use of an InfoCast (or similar) server that does <u>not</u> store content, as disclosed in Tso.

161.   In particular, the '415 patent teaches that "in response to the key press, the client module in cellular telephone 100 transmits a message, including a resource locator associated with the menu item selected by pressing the four key, to server computer 131 using data capable cellular telephone network 110 and corporate local area network 130." *Id.* at 17:1-6.  That is, the '415 patent discloses that a resource locator is sent to the content's location (server computer 131), and that the resource locator is not sent to an intermediate server (which does not contain content and is not the content's location) as disclosed in Tso.

162.   The *Enabling Mobile Network Managers* article states that "with Fax, Short Message Service (SMS), or e-mail instructions can be given to the human manager where to get more information (e.g. a URL to connect to with their WWW browser)"( *Id.* at pg. 7), again showing that the SMS message is sent to the content's location, not an intermediate server.

163.   Accordingly, the '415 patent, as well as the *Enabling Mobile Network Managers* article, render the claims of the '716 patent obvious.

164.   The new technological teaching of the '415 patent is not cumulative to the technological teachings provided in the other cited prior art documents, because the '415 patent presents the new teaching in a new light, particularly in view of amendments made to claim 15 (and included in new independent claims 83 and 110) during the course of prosecution of reexamination Control No. 90/009,880.

165.   In addition, the '415 patent and the *Enabling Mobile Network Managers* article teaches sending a request signal to the identified content's location.

166.   For at least the foregoing reasons, the '415 patent (Rossmann) in combination with the *Enabling Mobile Network Managers* renders obvious claims 15, 17, 18, 21, 24-27, 83, 92-94, 110, 112 and 113 of the '716 patent.

167.   The '415 patent was not relied on by the Examiner during prosecution of the application that gave rise to the '716 patent, or during Reexamination Control No. 90/009,880.

168.   With regard to Reexamination Control No. 95/001,738, the Examiner only

1   considered the '415 patent <u>alone</u> as rendering claim 15, as <u>originally issued</u> in the '716 patent,

2   as being obvious under 35 U.S.C. § 103(a).

3       169.   The Examiner took the position that for claim 15, as <u>originally issued</u> in the '716

4   patent, the '415 patent was cumulative with respect to U.S. Patent No. 6,047,327 to Tso et al.

5   ("Tso") as used in Reexamination Control No. 90/009,880, because Tso also disclosed the

6   limitations of claim 15 as originally issued in the '716 patent.

7       170.   In contrast to the Examiner's analysis in Reexamination Control No. 95/001,738,

8   the present request relies on the '415 patent in combination with the *Enabling Mobile Network*

9   *Managers* article for claim 15 as amended during the course of the Reexamination Control No.

10   90/009,880 proceeding.

11       171.   The '415 patent in combination with the *Enabling Mobile Network Managers*

12   article discloses all of the limitations of the claims listed above.

13       172.   The combination of the '415 patent and the *Enabling Mobile Network Managers*

14   article is at most the mere application of known techniques to a known system ready for

15   improvement to yield predictable results, thereby establishing a *prima facie* case of obviousness

16   justifying a rejection under 35 U.S.C. § 103 for each of the claims listed above.

17       173.   The '415 patent in combination with the *Enabling Mobile Network Managers*

18   article and the '973 patent renders obvious claims 16, 84, and 111 of the '716 patent.

19       174.   The '415 patent in combination with the *Enabling Mobile Network Managers*

20   and the '973 patent teaches all of the limitations of the claims listed above.

21       175.   Further, the combination of the '415 patent, the *Enabling Mobile Network*

22   *Managers* article and the '973 patent was not cited or discussed in the prosecution history of the

23   '716 patent, or during the course of the respective proceedings of Reexamination Control Nos.

24   90/009,880 and 95/001,738.

25       176.   During the course of prosecution of the Reexamination Control No. 90/009,880

26   proceeding, claim 16 was placed in independent form.  The Examiner confirmed the

27   patentability of independent claim 16, stating the following:  "The examiner further notes that

28   each of these claims require the reception of a command (to be executed for content) from the

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

38

cell phone <u>prior</u> to the cell phone receiving the content. The commands, as recited in the claims include one of delete the content, forward the content to a specified recipient, save the content, or reply to the content."  IFW of Reexamination Control No. 90/009,880, NIRC, pg. 8 (emphasis in original).

177.   The Examiner further stated, "The examiner notes that the citations relied upon in the Request failed to meet the claim language. The claim requires the cell phone to send a command to the system <u>prior</u> to receiving content. Thus, in the context of the claims, the cell phone user will get a notification of the content, and in response, the cell phone user will send a command so that the system can e.g., forward, save, delete etc., the content prior to the system sending the content to the cell phone."  IFW of Reexamination Control No. 90/009,880, NIRC, pg. 9 (emphasis in original).

178.   The '415 patent in combination with the *Enabling Mobile Network Managers* and the '973 patent discloses a system wherein the cell phone sends a command to the system <u>prior</u> to receiving content.

179.   In particular, the '973 patent discloses the claimed "wherein the memory controller is configured to execute a command sent from the cell phone, the execution being performed on the content prior to the system directing the content to the cell phone and comprising at least one of the following: delete the content, forward the content to a specified recipient, save the content, or reply to the content" limitation.

180.   For at least the foregoing reasons, the '415 patent (Rossmann) in combination with the *Enabling Mobile Network Managers* article and the '973 patent renders the asserted claims of the '716 patent obvious.

181.   Neither the *Enabling Mobile Network Managers* nor the '973 patent are of record in the original prosecution of the '716 patent, and were not relied on by the Examiner during prosecution of the application that gave rise to the '716 patent, or during Reexamination Control No. 90/009,880. Moreover, with regard to Reexamination Control No. 95/001,738, claim 16 was not requested for reexamination.

182.   The '973 patent is not cumulative to any of the technical teachings discussed

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

39

1    during the prosecution history of the '716 patent, or during the course of the Reexamination

2    Control No. 90/009,880 proceeding or the Reexamination Control No. 95/001,738 proceeding,

3    because the teachings of the '973 patent are contextually different from those of previously

4    considered prior art, and discloses the additional feature of "wherein the memory controller is

5    configured to execute a command sent from the cell phone, the execution being performed on

6    the content prior to the system directing the content to the cell phone and comprising at least one

7    of the following: delete the content, forward the content to a specified recipient, save the

8    content, or reply to the content" that the Examiner relied upon in confirming patentability over

9    the art of record in the *ex parte* reexamination proceeding.

10        183.   The '415 patent in combination with the *Enabling Mobile Network Managers*

11   article and the '973 patent discloses all of limitations of the claims listed above, and the

12   combination of the '415 patent and the *Enabling Mobile Network Managers* article and the '973

13   patent is at most the mere application of known techniques to a known system ready for

14   improvement to yield predicable results, thereby establishing a *prima facie* case of obviousness

15   justifying a rejection 35 U.S.C. § 103(a) for each of the claims listed above.

16        184.   The '415 patent in combination with the *Enabling Mobile Network Managers*

17   article and the '100 patent renders obvious claims 22, 23, 90, 91, 114 and 115 of the '716 patent.

18        185.   The '415 patent in combination with the *Enabling Mobile Network Managers*

19   and the '100 patent teaches all of the limitations of the claims listed above.

20        186.   The combination of the '415 patent, the *Enabling Mobile Network Managers*

21   article and the '100 patent was not cited or discussed in the prosecution history of the '716

22   patent, or during the course of the respective proceedings of Reexamination Control Nos.

23   90/009,880 and 95/001,738.

24        187.   The NIRC in the *ex parte* reexamination of the '716 patent confirmed the

25   patentability of amended claim 22, stating that the claims require that the notification indicate a

26   time the <u>content</u> itself -- and not an identifier of the content, such as the Info Bite disclosed in

27   the Tso patent -- is available.

28        188.   The '100 patent (Kane) discloses notification indicating a time the <u>content</u> itself,

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

40

1  and not an identifier of the content, such as the Info Bite disclosed in the Tso patent, is

2  available.

3       189.    The new technological teaching of the '100 patent is not cumulative to the

4  technological teachings provided in the other cited prior art documents, because the '100 patent

5  presents the new teaching in a new light, particularly in view of amendments made to claim 22

6  (and included in new claims 90, 91, 114 and 115) during the course of prosecution of

7  reexamination Control No. 90/009,880.

8       190.    The '100 patent provides the additional teaching regarding the notification

9  indicating a time the content itself is available.

10       191.    The '415 patent (Rossmann) in combination with the *Enabling Mobile Network*

11  *Managers* article and the '100 patent renders obvious the claims listed above.

12       192.    Neither the *Enabling Mobile Network Managers* nor the '100 patent are of record

13  in the original prosecution of the '716 patent, and were not relied on by the Examiner during

14  prosecution of the application that gave rise to the '716 patent, or during Reexamination Control

15  No. 90/009,880, nor considered in the denied *inter partes* request.

16       193.    Neither the *Enabling Mobile Network Managers* article nor the '100 patent are

17  cumulative to any of the technical teachings discussed during the prosecution history of the '716

18  patent, or during the course of the Reexamination Control No. 90/009,880 proceeding or the

19  Reexamination Control No. 95/001,738 proceeding, because the teachings of the *Enabling*

20  *Mobile Network Managers* article and the '100 patent are contextually different from those of

21  previously considered prior art.  Moreover, the '100 patent discloses the feature "specifying a

22  time that the content is available" that the Examiner relied upon in confirming patentability over

23  the art of record in the *ex parte* reexamination proceeding.

24       194.    The '415 patent in combination with the *Enabling Mobile Network Managers*

25  article and the '100 patent discloses all of limitations of the claims listed above, and the

26  combination of the '415 patent and the *Enabling Mobile Network Managers* article and the '100

27  patent is at most the mere application of known techniques to a known system ready for

28  improvement to yield predicable results, thereby establishing a *prima facie* case of obviousness

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

41

1    justifying a rejection 35 U.S.C. § 103(a) for each of the claims listed above.

2          195.   The '415 patent in combination with the *Enabling Mobile Network Managers*

3    article and the Furuta publication renders obvious claims 22, 23, 90, 91, 114 and 115 of the '716

4    patent.

5          196.   The '415 patent in combination with the *Enabling Mobile Network Managers*

6    and the Furuta publication teaches all of the limitations of the claims listed above.

7          197.   The combination of the '415 patent, the *Enabling Mobile Network Managers*

8    article and the Furuta publication was not cited or discussed in the prosecution history of the

9    '716 patent, or during the course of the respective proceedings of Reexamination Control Nos.

10   90/009,880 and 95/001,738.

11         198.   The NIRC in the *ex parte* reexamination confirmed the patentability of amended

12   claim 22, stating that the claims require that the notification indicate a time the <u>content</u> itself --

13   and not an identifier of the content, such as the Info Bite disclosed in the Tso patent -- is

14   available.

15         199.   The Furuta publication discloses notification indicating a time the <u>content</u> itself,

16   and not an identifier of the content, such as the Info Bite disclosed in the Tso patent, is

17   available.

18         200.   The new technological teaching of the Furuta publication is not cumulative to the

19   technological teachings provided in the other cited prior art documents, because the Furuta

20   publication presents the new teaching in a new light, particularly in view of amendments made

21   to claim 22 (and included in new claims 90, 91, 114 and 115) during the course of prosecution

22   of reexamination Control No. 90/009,880.

23         201.   In addition, the Furuta publication provides the additional teaching regarding the

24   notification indicating a time the content itself is available.  For at least the foregoing reasons,

25   the '415 patent (Rossmann) in combination with the *Enabling Mobile Network Managers* article

26   and the Furuta publication render the asserted claims of the '716 patent obvious.

27         202.   Neither the *Enabling Mobile Network Managers* nor the Furuta publication were

28   of record in the prosecution of the '716 patent, and were not relied on by the Examiner during

1    prosecution of the application that gave rise to the '716 patent, or during Reexamination Control

2    No. 90/009,880, nor considered in the denied *inter partes* request.

3        203.    The '415 patent in combination with the *Enabling Mobile Network Managers*

4    article and the Furuta publication discloses all of limitations of the claims listed above, and the

5    combination of the '415 patent and the *Enabling Mobile Network Managers* article and the

6    Furuta publication is at most the mere application of known techniques to a known system ready

7    for improvement to yield predicable results, thereby establishing a *prima facie* case of

8    obviousness justifying a rejection 35 U.S.C. § 103(a) for each of the claims listed above.

9        204.    The '415 patent in combination with the *Enabling Mobile Network Managers*

10   article and the '616 patent renders obvious claims 28-33, 37, 40-42, 85, 86, 89, 95-97, 99, 100,

11   103, 104, 107, and 108 of the '716 patent.

12       205.    The '415 patent in combination with the *Enabling Mobile Network Managers*

13   article and the '616 patent teaches all of the limitations of the claims listed above.

14       206.    The combination of the '415 patent, the *Enabling Mobile Network Managers*

15   article and the '616 patent was not cited or discussed in the prosecution history of the '716

16   patent, or during the course of the respective proceedings of Reexamination Control Nos.

17   90/009,880 and 95/001,738.

18       207.    The '415 patent in combination with the *Enabling Mobile Network Managers*

19   Article discloses a system wherein the cell phone sends a request signal to the identified

20   content's location, without the use of an InfoCast (or similar) server that does <u>not</u> store content,

21   as disclosed in Tso.

22       208.    The '415 patent, as well as the *Enabling Mobile Network Managers* article,

23   provide a new, non-cumulative technological teaching that was not before the PTO in the prior

24   proceedings for the '716 patent, and therefore render obvious claims 15 and 30, and the claims

25   depending therefrom, as well as claims 83 and 97, and the claims depending therefrom.

26       209.    The '415 patent was not relied on by the Examiner during prosecution of the

27   application that gave rise to the '716 patent, or during Reexamination Control No. 90/009,880.

28       210.    The '415 patent in combination with the *Enabling Mobile Network Managers*

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

43

1    article and the '616 patent discloses all of the limitations of the claims listed above, and the

2    combination of the '415 patent and the *Enabling Mobile Network Managers* article and the '616

3    patent is at most the mere application of known techniques to a known system ready for

4    improvement to yield predictable results, thereby establishing a *prima facie* case of obviousness

5    justifying a rejection under 35 U.S.C. § 103 for each of the claims listed above.

6        211.    The '415 patent in combination with the *Enabling Mobile Network Managers*

7    article and the '973 and '616 patents renders obvious claims 31, 43, 98, and 109 of the '716

8    patent.

9        212.    The '415 patent in combination with the *Enabling Mobile Network Managers*

10   article, and the '973 patent and the '616 patent teaches all of the limitations of the claims listed

11   above.

12       213.    The combination of the '415 patent, the *Enabling Mobile Network Managers*

13   article, the '973 patent and the '616 patent was not cited or discussed in the prosecution history

14   of the '716 patent, or during the course of the respective proceedings of Reexamination Control

15   Nos. 90/009,880 and 95/001,738.

16       214.    During the course of prosecution of the Reexamination Control No. 90/009,880

17   proceeding, claims 31 and 43 were placed in independent form.  The Examiner confirmed the

18   patentability of these claims, citing the following features:  "for claim 31; "receiving from the

19   cell phone, prior to transmitting the available content to the cell phone, a command created at

20   the cell phone" for claim 43 and "the cellular phone, prior to receiving the media content,

21   instructing the remote content storage system, via the cellular network, to forward the media

22   content to another" for claim 58."  IFW of Reexamination Control No. 90/009,880, NIRC, pg. 8.

23       215.    The '415 patent in combination with the *Enabling Mobile Network Managers*

24   and the '973 patent discloses a system wherein the cell phone sends a command to the system

25   prior to receiving content.  In particular, the '973 patent discloses the claimed "receiving from

26   the cell phone, prior to transmitting the available content to the cell phone, a command created

27   at the cell phone" (claim 31) and "the cellular phone, prior to receiving the media content,

28   instructing the remote content storage system, via the cellular network, to forward the media

1  content to another" (claim 43) limitations.

2  216.    The new technological teaching of the '973 patent is not cumulative to the

3  technological teachings provided in the other cited prior art documents, because the '973 patent

4  presents the new teaching in a new light, particularly in view of the Examiner's reason for

5  confirmation of patentability for claims 31 and 43 (and claims 98 and 109 that include a similar

6  limitation) during the course of prosecution of reexamination Control No. 90/009,880.

7  217.    The '973 patent is not cumulative to any of the technical teachings discussed

8  during the prosecution history of the '716 patent, or during the course of the Reexamination

9  Control No. 90/009,880 proceeding or the Reexamination Control No. 95/001,738 proceeding,

10  because the teachings of the '973 patent are contextually different from those of previously

11  considered prior art, and discloses the additional feature of "performing an action requested by

12  the cell phone on the available content prior to transmitting the available content to the cell

13  phone comprising at least one of the following: delete the content, forward the content to a

14  specified recipient, save the content, or reply to the content" that the Examiner relied upon in

15  confirming patentability over the art of record in the *ex parte* reexamination proceeding.

16  218.    The '415 patent in combination with the *Enabling Mobile Network Managers*

17  article and the '973 and '616 patents discloses all of limitations of the claims listed above, and

18  the combination of the '415 patent and the *Enabling Mobile Network Managers* article and the

19  '973 and '616 patents is at most the mere application of known techniques to a known system

20  ready for improvement to yield predicable results, thereby establishing a *prima facie* case of

21  obviousness justifying a rejection 35 U.S.C. § 103(a) for each of the claims listed above.

22  219.    The '415 patent in combination with the *Enabling Mobile Network Managers*

23  article, the '100 patent and the '616 patent render obvious claims 38, 39, 105 and 106 of the

24  '716 patent.

25  220.    The '415 patent in combination with the *Enabling Mobile Network Managers*,

26  the '100 patent and the '616 patent teaches all of the limitations of claim 38.

27  221.    The combination of the '415 patent, the *Enabling Mobile Network Managers*

28  article, the '100 patent and the '616 patent was not cited or discussed in the prosecution history

1   of the '716 patent, or during the course of the respective proceedings of Reexamination Control

2   Nos. 90/009,880 and 95/001,738.

3       222.   The NIRC in the *ex parte* reexamination confirmed the patentability of amended

4   claim 38, stating that the claims require that the notification indicate a time the <u>content</u> itself --

5   and not an identifier of the content, such as the Info Bite disclosed in the Tso patent -- is

6   available.

7       223.   The '100 patent (Kane) discloses notification indicating a time the content itself,

8   and not an identifier of the content, such as the Info Bite disclosed in the Tso patent, is

9   available.  As such, the '100 patent provides a new, non-cumulative technological teaching not

10  considered by the Examiner in the prior proceedings for the '716 patent.

11      224.   The new technological teaching of the '100 patent is not cumulative to the

12  technological teachings provided in the other cited prior art documents, because the '100 patent

13  presents the new teaching in a new light, particularly in view of amendments made to claim 38

14  (and claim 105 that includes a similar limitation) during the course of prosecution of

15  reexamination Control No. 90/009,880.

16      225.   In addition, the '100 patent provides the additional teaching regarding the

17  notification indicating a time the content itself is available.

18      226.   For at least the foregoing reasons, the '415 patent (Rossmann) in combination

19  with the *Enabling Mobile Network Managers* article and the '100 and '616 patents renders

20  obvious the claims of the '716 patent listed above.

21      227.   Neither the *Enabling Mobile Network Managers* nor the '100 patent are of record

22  in the original prosecution of the '716 patent, and were not relied on by the Examiner during

23  prosecution of the application that gave rise to the '716 patent, or during Reexamination Control

24  No. 90/009,880, nor considered in the denied *inter partes* request.

25      228.   The '415 patent in combination with the *Enabling Mobile Network Managers*

26  article and the '100 and '616 patents discloses all of limitations of the claims listed above, and

27  the combination of the '415 patent and the *Enabling Mobile Network Managers* article and the

28  '100 and '616 patents is at most the mere application of known techniques to a known system

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

46

1   ready for improvement to yield predicable results, thereby establishing a *prima facie* case of

2   obviousness justifying a rejection 35 U.S.C. § 103(a) for each of the claims listed above.

3       229.   The '415 patent in combination with the *Enabling Mobile Network Managers*

4   article, the Furuta publication and the '616 patent renders obvious claims 38, 39, 105 and 106 of

5   the '716 patent.

6       230.   The '415 patent in combination with the *Enabling Mobile Network Managers*,

7   the Furuta publication and the '616 patent teaches all of the limitations of claim 38.

8       231.   The combination of the '415 patent, the *Enabling Mobile Network Managers*

9   article, the Furuta publication and the '616 patent was not cited or discussed in the prosecution

10   history of the '716 patent, or during the course of the respective proceedings of Reexamination

11   Control Nos. 90/009,880 and 95/001,738.

12       232.   The NIRC in the *ex parte* reexamination confirmed the patentability of amended

13   claim 38, stating that the claims require that the notification indicate a time the <u>content</u> itself --

14   and not an identifier of the content, such as the Info Bite disclosed in the Tso patent -- is

15   available.

16       233.   Neither the *Enabling Mobile Network Managers* nor the Furuta publication are of

17   record in the original prosecution of the '716 patent, and were not relied on by the Examiner

18   during prosecution of the application that gave rise to the '716 patent, or during Reexamination

19   Control No. 90/009,880, nor considered in the denied *inter partes* request.

20       234.   The '415 patent in combination with the *Enabling Mobile Network Managers*

21   article and the Furuta publication and the '616 patent discloses all of limitations of the claims

22   listed above, and the combination of the '415 patent and the *Enabling Mobile Network*

23   *Managers* article and the Furuta publication and the '616 patent is at most the mere application

24   of known techniques to a known system ready for improvement to yield predicable results,

25   thereby establishing a *prima facie* case of obviousness justifying a rejection 35 U.S.C. § 103(a)

26   for each of the claims listed above.

27       235.   The NAIS Article in combination with the '100 patent renders obvious claims 15,

28   17, 18, 21, 25-27, 83, 85, 86, 89, 92-94, 110 and 112-115 of the '716 patent.

236.    The NAIS Article in combination with the '100 patent teaches all of the limitations of the claims listed above.

237.    The combination of the NAIS Article and the '100 patent was not cited or discussed in the prosecution history of the '716 patent, or during the course of the respective proceedings of Reexamination Control Nos. 90/009,880 and 95/001,738.

238.    As noted above, claim 15 was amended in the *ex parte* reexamination proceeding to recite that original independent claim 15 of the '716 patent. The examiner allowed these amended claims over Tso because, according to the Examiner, Tso does not use the resource identifier to send a request signal to the identified content's location. Instead, Tso discloses that the request signal is directed to the InfoCast Server—a server which does not contain content— and that the request signal is <u>not</u> transmitted to the content's locations (for example, a server that includes (or stores) content).  *See*, IFW of Reexamination Control No. 90/009,880, NIRC, pg. 6.

239.    The NAIS Article discloses a system wherein the cell phone sends a request signal to the identified content's location, without the use of an InfoCast (or similar) server that does <u>not</u> store content, as disclosed in Tso.  In particular, the NAIS Article discloses a system wherein an "incoming SMS message is processed for the email message retrieval."  *Id.* at pg. 654; *see also* NAIS Article Fig. 2.  That is, the NAIS Article discloses that a resource locator is sent to the content's location (NAIS System), and that the resource locator is <u>not</u> sent to an InfoCast or other intermediate server (which does not contain content and is not the content's location) as disclosed in Tso.

240.    The NAIS Article in combination with the '100 patent discloses all of the limitations of the claims listed above, and the combination of the NAIS Article and the '100 patent is at most the mere application of known techniques to a known system ready for improvement to yield predictable results, thereby establishing a *prima facie* case of obviousness justifying a rejection under 35 U.S.C. § 103 for each of the claims listed above.

241.    The NAIS Article in combination with the '100 patent and JP H8-181781 (Furuta) teaches all of the limitations of the claims listed above.

242.    The combination of the NAIS Article with the '100 patent and the Furuta

1   publication was not cited or discussed in the prosecution history of the '716 patent, or during the

2   course of the respective proceedings of Reexamination Control Nos. 90/009,880 and

3   95/001,738.

4        243.    The NIRC in the *ex parte* reexamination confirmed the patentability of claim 114

5   of the '716 patent (from which claim 115 depends), stating that the claims require that the

6   notification indicate a time the content itself -- and not an identifier of the content, such as the

7   Info Bite disclosed in the Tso patent -- is available.  The Furuta publication discloses

8   notification indicating a time the content itself, and not an identifier of the content, such as the

9   Info Bite disclosed in the Tso patent, is available.  As such, the Furuta publication provides a

10   new, non-cumulative technological teaching not considered by the Examiner in the prior

11   proceedings for the '716 patent.

12        244.    Moreover, the Furuta publication discloses the feature "specifying a time that the

13   content is available" that the Examiner relied upon in confirming patentability over the art of

14   record in the *ex parte* reexamination proceeding.

15        245.    The NAIS Article in combination with the '100 patent and the Furuta publication

16   discloses all of limitations of the claims listed above, and the combination of the NAIS Article

17   with the '100 patent and the Furuta publication is at most the mere application of known

18   techniques to a known system ready for improvement to yield predicable results, thereby

19   establishing a *prima facie* case of obviousness justifying a rejection 35 U.S.C. § 103(a) for each

20   of the claims listed above.

21        246.    The NAIS Article in combination with the '100 patent and the '973 patent

22   establishes that claims 16, 84 and 111 of the '716 patent are obvious.  The NAIS Article in

23   combination with the '100 patent and the '973 patent teaches all of the limitations of the claims

24   listed above.

25        247.    The combination of the NAIS Article, the '100 patent and the '973 patent was

26   not cited or discussed in the prosecution history of the '716 patent, or during the course of the

27   respective proceedings of Reexamination Control Nos. 90/009,880 and 95/001,738.

28        248.    During the course of prosecution of the Reexamination Control No. 90/009,880

proceeding, claim 16 was placed in independent form. The Examiner confirmed the patentability of independent claim 16, stating the following:

> The examiner further notes that each of these claims require the reception of a command (to be executed for content) from the cell phone prior to the cell phone receiving the content. The commands, as recited in the claims include one of delete the content, forward the content to a specified recipient, save the content, or reply to the content.
>
> IFW of Reexamination Control No. 90/009,880, NIRC, pg. 8 (emphasis in original).
>
> The examiner notes that the citations relied upon in the Request failed to meet the claim language. The claim requires the cell phone to send a command to the system prior to receiving content. Thus, in the context of the claims, the cell phone user will get a notification of the content, and in response, the cell phone user will send a command so that the system can e.g., forward, save, delete etc., the content prior to the system sending the content to the cell phone.
>
> IFW of Reexamination Control No. 90/009,880, NIRC, pg. 9 (emphasis in original).

249.    The NAIS Article in combination with the '100 patent and the '973 patent discloses a system wherein the cell phone sends a command to the system prior to receiving content.  In particular, the '973 patent discloses the claimed "wherein the memory controller is configured to execute a command sent from the cell phone, the execution being performed on the content prior to the system directing the content to the cell phone and comprising at least one of the following: delete the content, forward the content to a specified recipient, save the content, or reply to the content" limitation.

250.    Neither the '100 patent nor the '973 patent are of record, and were not relied on by the Examiner during prosecution of the application that gave rise to the '716 patent, or during Reexamination Control No. 90/009,880.  With regard to Reexamination Control No. 95/001,738, claim 16 was not requested for reexamination.

251.    The NAIS Article and the '100 and '973 patents disclose all of limitations of the claims listed above, and the combination of the NAIS Article and the '100 and '973 patents is at most the mere application of known techniques to a known system ready for improvement to

ANSWER, DEFENSES, FIRST COUNTERCLAIM, AMENDED SECOND COUNTERCLAIM, AND JURY DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

50

1   yield predicable results, thereby establishing a *prima facie* case of obviousness under 35 U.S.C.

2   § 103(a) for each of the claims listed above.

3       252.   The NAIS Article in combination with the *Enabling Mobile Network Managers*

4   article and the '100 patent render obvious claims 22-24, 90 and 91 of the '716 patent. The NAIS

5   Article in combination with the *Enabling Mobile Network Managers* and the '100 patent teaches

6   all of the limitations of the claims listed above.

7       253.   The combination of the NAIS Article, the *Enabling Mobile Network Managers*

8   article and the '100 patent was not cited or discussed in the prosecution history of the '716

9   patent, or during the course of the respective proceedings of Reexamination Control Nos.

10   90/009,880 and 95/001,738.

11       254.   The NAIS Article in combination with the *Enabling Mobile Network Managers*

12   article and the '100 patent render obvious claims 22-24, 90 and 91, since the '100 patent

13   discloses the claimed "specifying a time that the content is available" limitation that the

14   Examiner considered to be the distinguishing feature over the prior art of record in the *ex parte*

15   reexamination of the '716 patent.

16       255.   The NAIS Article in combination with the *Enabling Mobile Network Managers*

17   article and the '100 patent discloses all of limitations of the claims listed above, and the

18   combination of the NAIS Article and the *Enabling Mobile Network Managers* article and the

19   '100 patent is at most the mere application of known techniques to a known system ready for

20   improvement to yield predicable results, thereby establishing a *prima facie* case of obviousness

21   under 35 U.S.C. § 103(a) for each of the claims listed above.

22       256.   The NAIS Article in combination with the *Enabling Mobile Network Managers*

23   article and the '100 patent and the Furuta publication render obvious claims 22, 23, 90 and 91 of

24   the '716 patent.  The NAIS Article in combination with the *Enabling Mobile Network Managers*

25   and the '100 patent and the Furuta publication teaches all of the limitations of the claims listed

26   above.

27       257.   The combination of the NAIS Article, the *Enabling Mobile Network Managers*

28   article and the '100 patent and the Furuta publication was not cited or discussed in the

1  prosecution history of the '716 patent, or during the course of the respective proceedings of

2  Reexamination Control Nos. 90/009,880 and 95/001,738.

3       258.    The NAIS Article in combination with the *Enabling Mobile Network Managers*

4  article and the '100 patent and the Furuta publication discloses all limitations of the claims

5  listed above, and the combination of the NAIS Article and the *Enabling Mobile Network*

6  *Managers* article and the '100 patent and the Furuta publication is at most the mere application

7  of known techniques to a known system ready for improvement to yield predicable results,

8  thereby establishing a *prima facie* case of obviousness under 35 U.S.C. § 103(a) for each of the

9  claims listed above.

10       259.    The NAIS Article in combination with the '100 patent and the '616 patent render

11  obvious claims 28-30, 32, 33, 38, 41, 42, 95, 96, 97, 99, 100 and 103-108 of the '716 patent.

12  The NAIS Article in combination with the '100 patent and the '616 patent teaches all of the

13  limitations of the claims listed above.

14       260.    The combination of the NAIS Article, the '100 patent and the '616 patent was

15  not cited or discussed in the prosecution history of the '716 patent, or during the course of the

16  respective proceedings of Reexamination Control Nos. 90/009,880 and 95/001,738.

17       261.    The examiner allowed amended claims 15 and 30 over Tso because, according to

18  the Examiner, Tso does not use the resource identifier to send a request signal to the identified

19  content's location. Instead, Tso discloses that the request signal is directed to the InfoCast

20  Server—a server which does not contain content—and that the request signal is <u>not</u> transmitted

21  to the content's locations (for example, a server that includes (or stores) content).  *See*, IFW of

22  Reexamination Control No. 90/009,880, NIRC, pg. 6.  Each of the claims listed above depend

23  directly or indirectly from amended claims 15 and 30, or new claims 83 and 97 that include a

24  similar limitation.

25       262.    The NAIS Article in combination with the '100 patent discloses a system

26  wherein the cell phone sends a request signal to the identified content's location, without the use

27  of an InfoCast (or similar) server that does not store content, as disclosed in Tso.  Both the

28  NAIS Article and the '100 patent disclose the claimed "memory controller is configured to

1   direct the content corresponding to the content identifier from the memory to the cell phone only

2   upon receiving a request from the cell phone at the identified content's location to do so"

3   limitation.

4   263.   The NAIS Article in combination with the '100 patent and the '616 patent

5   discloses all of the limitations of the claims listed above, and the combination of the NAIS

6   Article and the 100 patent and the '616 patent is at most the mere application of known

7   techniques to a known system ready for improvement to yield predictable results, thereby

8   establishing a *prima facie* case of obviousness under 35 U.S.C. § 103 for each of the claims

9   listed above.

10   264.   The NAIS Article in combination with the '100 patent, the Furuta publication

11   and the '616 patent renders claims 38, 39, 105 and 106 of the '716 patent obvious. The NAIS

12   Article in combination with the '100 patent, the Furuta publication and the '616 patent teaches

13   all of the limitations of claim 38.

14   265.   The combination of the NAIS Article, the '100 patent, the Furuta publication and

15   the '616 patent was not cited or discussed in the prosecution history of the '716 patent, or during

16   the course of the respective proceedings of Reexamination Control Nos. 90/009,880 and

17   95/001,738.

18   266.   The NAIS Article in combination with the '100 patent and the Furuta publication

19   and the '616 patent discloses all of limitations of the claims listed above, and the combination of

20   the NAIS Article and the '100 patent and the Furuta publication and the '616 patent is at most

21   the mere application of known techniques to a known system ready for improvement to yield

22   predicable results, thereby establishing a *prima facie* case of obviousness under 35 U.S.C. §

23   103(a) for each of the claims listed above.

24   267.   The NAIS Article in combination with the '100 patent, the '616 patent and the

25   *Enabling Mobile Network Managers* article render claims 37, 39 and 40 of the '716 patent

26   obvious. The NAIS Article in combination with the '100 patent, the '616 patent and the

27   *Enabling Mobile Network Managers* article teaches all of the limitations of claims 37, 39 and

28   40.

268.    The combination of the NAIS Article, the '100 patent, the '616 patent and the *Enabling Mobile Network Managers* article was not cited or discussed in the prosecution history of the '716 patent, or during the course of the respective proceedings of Reexamination Control Nos. 90/009,880 and 95/001,738.  Claims 37, 39 and 40 depend from claim 30.

269.    The NAIS Article in combination with the '100 patent and the '616 patent and the *Enabling Mobile Network Managers* article discloses all of the limitations of the claims listed above, and the combination of the NAIS Article, the '100 patent, the '616 patent and the *Enabling Mobile Network Managers* article is at most the mere application of known techniques to a known system ready for improvement to yield predictable results, thereby establishing a *prima facie* case of obviousness under 35 U.S.C. § 103 for each of the claims listed above.

270.    The NAIS Article in combination with the '100 patent, the '616 patent and the '973 patent render claims 31, 43, 98 and 109 of the '716 patent obvious.  The NAIS Article in combination with the '100 patent, the '616 patent and the '973 patent teaches all of the limitations of the claims 31, 43, 98 and 109.

271.    The combination of the NAIS Article in combination with the '100 patent, the '616 patent and the '973 patent was not cited or discussed in the prosecution history of the '716 patent, or during the course of the respective proceedings of Reexamination Control Nos. 90/009,880 and 95/001,738.

272.    During the course of prosecution of the Reexamination Control No. 90/009,880 proceeding, claims 31 and 43 were placed in independent form.  The Examiner confirmed the patentability of these claims, citing the following features:

> for claim 31; "receiving from the cell phone, prior to transmitting the available content to the cell phone, a command created at the cell phone" for claim 43 and "the cellular phone, prior to receiving the media content, instructing the remote content storage system, via the cellular network, to forward the media content to another" for claim 58.

> IFW of Reexamination Control No. 90/009,880, NIRC, pg. 8.

273.    The NAIS Article in combination with the '100 patent, the '616 patent, and the

'973 patent discloses a system wherein the cell phone sends a command to the system prior to receiving content.  In particular, the '973 patent discloses the claimed "receiving from the cell phone, prior to transmitting the available content to the cell phone, a command created at the cell phone" (claim 31) and "the cellular phone, prior to receiving the media content, instructing the remote content storage system, via the cellular network, to forward the media content to another" (claim 43) limitations.

274.    The NAIS Article and the '100, '973 and '616 patents discloses all of the limitations of the claims listed above, and the combination of the NAIS Article and the '100, '973 and '616 patents is at most the mere application of known techniques to a known system ready for improvement to yield predicable results, thereby establishing a *prima facie* case of obviousness under 35 U.S.C. § 103(a) for each of the claims listed above.

275.    The '973 patent in combination with the '100 patent renders claims 15-18, 21-27, 83-86, 89-94, and 110-115 of the '716 patent obvious.  The '973 patent in combination with the '100 patent teaches all of the limitations of the claims listed above.

276.    The combination of the '973 patent and the '100 patent was not cited or discussed in the prosecution history of the '716 patent, or during the course of the respective proceedings of Reexamination Control Nos. 90/009,880 and 95/001,738.

277.    In addition, the '973 patent provides the additional teaching regarding sending a request signal to the identified content's location.  For at least the foregoing reasons, the '973 patent in combination with the '100 Patent renders obvious independent claim 15, dependent claims 17, 18, 21 and 24-27 which depend therefrom, and newly added claims 83-86, 89-94, and 110-115, since the '973 patent discloses the claimed "receiving a request from the cell phone at the identified content's location" limitation.

278.    During the course of prosecution of the Reexamination Control No. 90/009,880 proceeding, claim 16 was placed in independent form. The Examiner confirmed the patentability of independent claim 16 (quoted earlier in this amended counterclaim).

279.    The combination of the '973 and '100 patents discloses all of the limitations of the claims listed above, and the combination of the '100 and '973 patents is at most the mere

application of known techniques to a known system ready for improvement to yield predicable results, thereby establishing a *prima facie* case of obviousness justifying a rejection 35 U.S.C. § 103(a) for each of the claims listed above.

280.    The '973 patent in combination with the '100 patent and the Furuta publication renders claims 22, 23, 90, 91, 114 and 115 of the '716 patent obvious.  The '973 patent in combination with the '100 patent and the Furuta publication teaches all of the limitations of the claims listed above.

281.    The combination of the '973 patent and the '100 patent and the Furuta publication was not cited or discussed in the prosecution history of the '716 patent, or during the course of the respective proceedings of Reexamination Control Nos. 90/009,880 and 95/001,738.

282.    The '973 patent in combination with the '100 patent and the Furuta publication discloses all the limitations of the claims listed above, and the combination of the '973 patent and the '100 patent and the Furuta publication is at most the mere application of known techniques to a known system ready for improvement to yield predicable results, thereby establishing a *prima facie* case of obviousness under 35 U.S.C. § 103(a) for each of the claims listed above.

283.    The '973 patent in combination with the '100 patent and the '616 patent renders claims 28-33, 37-43, 95-100, and 103-109 of the '716 patent obvious. The '973 patent in combination with the '100 patent and the '616 patent teaches all of the limitations of the claims listed above.

284.    The combination of the '973 patent, the '101 patent and the '616 patent was not cited or discussed in the prosecution history of the '716 patent, or during the course of the respective proceedings of Reexamination Control Nos. 90/009,880 and 95/001,738.

285.    The '973 patent in combination with the '100 and '616 patents discloses a system wherein the cell phone sends a request signal to the identified content's location, without the use of an InfoCast (or similar) server that does not store content, as disclosed in Tso.  Both the '973 patent and the '100 patent disclose the claimed "memory controller is configured to direct the

1    content corresponding to the content identifier from the memory to the cell phone only upon

2    receiving a request from the cell phone at the identified content's location to do so" limitation.

3        286.    The '973 patent in combination with the '100 patent and the '616 patent discloses

4    a system wherein the cell phone sends a command to the system prior to receiving content.  In

5    particular, the '973 patent discloses the claimed "receiving from the cell phone, prior to

6    transmitting the available content to the cell phone, a command created at the cell phone" (claim

7    31) and "the cellular phone, prior to receiving the media content, instructing the remote content

8    storage system, via the cellular network, to forward the media content to another" (claim 43)

9    limitations.

10       287.    The '973 patent in combination with the '100 patent and the '616 patent discloses

11   all of the limitations of the claims listed above, and the combination of the '973 patent and the

12   100 patent and the '616 patent is at most the mere application of known techniques to a known

13   system ready for improvement to yield predictable results, thereby establishing a *prima facie*

14   case of obviousness under 35 U.S.C. § 103 for each of the claims listed above.

15       288.    The '973 patent in combination with the '100 patent, the Furuta publication and

16   the '616 patent renders claims 38, 39, 105 and 106 of the '716 patent. The '973 patent in

17   combination with the '100 patent, the Furuta publication and the '616 patent teaches all of the

18   limitations of claim 38.

19       289.    The combination of the '973 patent, the '100 patent, the Furuta publication and

20   the '616 patent was not cited or discussed in the prosecution history of the '716 patent, or during

21   the course of the respective proceedings of Reexamination Control Nos. 90/009,880 and

22   95/001,738.

23       290.    The '973 patent in combination with the '100 patent and the Furuta publication

24   and the '616 patent discloses all of limitations of the claims listed above, and the combination of

25   the '973 patent and the '100 patent and the Furuta publication and the '616 patent is at most the

26   mere application of known techniques to a known system ready for improvement to yield

27   predicable results, thereby establishing a *prima facie* case of obviousness under 35 U.S.C. §

28   103(a) for each of the claims listed above.

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

57

***The '838 Patent***

291.    For example, and without any limitation, combinations of prior art that render claims 1-30, 32, 34-53, 55-57, 59-63, and 69-96 of the '838 patent (and other claims, not asserted against PNI) invalid as anticipated under 35 U.S.C. section 102 and/or obvious under 35 U.S.C. section 103 include, but are not limited to:

292.    The '327 Patent (Tso) (Claims 1-30, 32, 34-53, 55-57, 59-63, and 69-96 of the '838 Patent);

293.    The '327 Patent (Tso)  in combination with the Always On article  (Claims 14 and 17 of the '838 Patent);

294.    The '327 Patent (Tso) in combination with RFC 1911 (Claim 54 of the '838 Patent);

295.    The '327 Patent (Tso) in combination with RFC 1487 (Claim 58 of the '838 Patent);

296.    The '327 Patent (Tso) in combination with the '449 Patent (Metroka) (Claims 31 and 33 of the '838 Patent);

297.    The '327 Patent (Tso) in combination with the '305 Patent (Sattar) (Claims 67 and 68 of the '838 Patent);

298.    The '327 Patent (Tso) in combination with the '845 Patent (Buhrmann) (Claim 64 of the '838 Patent);

299.    The '327 Patent (Tso) in combination with the '382 Patent (Nikas) (Claim 65 of the '838 Patent);

300.    The '327 Patent (Tso) in combination with the '067 Patent (Nguyen) (Claim 66 of the '838 Patent);

301.    The '327 Patent (Tso) in combination with the '616 Patent (Bjorndahl) (Claims 9-20 of the '838 Patent);

302.    The '327 Patent (Tso) in combination with the '616 Patent (Bjorndahl) (Claims 14 and 17 of the '838 Patent);

303.    *Rover Toolkit*, *Rover Mosaic* and the '824 Patent (Lu) (Claims 1-7, 9-16, 18-25,

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

58

27-32, 36 and 37 of the '838 Patent);

304. *Rover Toolkit*, *Rover Mosaic*, the '824 Patent (Lu) and the Always On article (Claim 17 of the '838 Patent);

305. *Rover Toolkit*, *Rover Mosaic* and the '616 Patent (Bjorndahl) (Claims 8, 38-53, 59-63 and 69-96 of the '838 Patent);

306. *Rover Toolkit*, *Rover Mosaic* and the '449 Patent (Metroka) (Claim 33 of the '838 Patent);

307. *Rover Toolkit*, *Rover Mosaic*, the '616 Patent (Bjorndahl) and RFC 1487 (Claim 58 of the '838 Patent); and

308. *Rover Toolkit*, *Rover Mosaic*, the '616 Patent (Bjorndahl) and the '446 Patent (Jasinski) (Claim 63 of the '838 Patent).

309. Combinations of prior art that render the asserted claims invalid, including but not limited to the combinations identified in paragraphs 293-308 above) are at most the mere combination of known elements according to a known method to yield predictable results, or the mere application of known techniques to a known system ready for improvement to yield predictable results, rendering the claims invalid under 35 U.S.C. § 103.

310. The '838 patent pertains to "selective paging." According to the '838 patent, a paging system notifies a paging transceiver that a message has been received or that information is available but does not initially transmit the associated message or information. The user, upon being notified of the page, can then use a system identifier or an information identifier that points to the information to then download the entire message at a time convenient to the user, which may allow the user to download messages or information at less-expensive off-peak hours or allow the user to place the paging transceiver at a location where it can more easily receive a message or information and reply to a message. Since the messages or other information are not initially transmitted to the paging transceiver, the paging transceiver can receive and store a greater number of pages with minimal increase in the size of memory. Further, because entire messages or information are not automatically transmitted and since the user can position the paging transceiver to issue a sufficiently strong reply to a message or

ANSWER, DEFENSES, FIRST COUNTERCLAIM, AMENDED SECOND COUNTERCLAIM, AND JURY DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

59

1   request for information, traffic in the paging system can be controlled and reduced. '838 patent,

2   3:3-19.

3   311.    The '327 patent was filed on February 16, 1996.

4   312.    The '327 patent qualifies as prior art for the '838 patent under 35 U.S.C. §

5   102(e).

6   313.    The '327 patent was not cited by the Applicant during prosecution or used by the

7   Examiner in making any rejections during prosecution.

8   314.    The '327 patent is highly material to the issued claims of the '838 patent.  The

9   '327 patent discloses an InfoCast server that sends a portion of available information or a

10  pointer to the information, such as a uniform resource locator (URL), directly to the user. This

11  allows the user to decide whether and when to download further information, and

12  advantageously alleviates the user from having to rely on her/his own efforts to locate and

13  retrieve information of interest. The portion of information or pointer that is sent to the user is

14  called an "InfoBite." The "InfoBites" sent to a user may depend on various factors, such as the

15  location of the user, time of day, and the information contained in a user profile. The user

16  profile indicates the areas of interest of the user and can be dynamically adjusted based on user

17  feedback. '327 patent, 1:44-52.

18  315.    The '327 patent discloses that the InfoCast server may send a message including

19  a resource identifier, for example, the string "FFFFFF", in an InfoBite message to the user. '327

20  patent, 24:43-60. If the user wishes to obtain the full content corresponding to the InfoBite, the

21  user may send a message containing the resource identifier back to the InfoCast server, which

22  may then serve the detailed content to the user. Id. The resource identifier "FFFFFF" may

23  correspond, for example, to the URL "FTP://FTP.InfoCast.net/stories/warming.wav". '327

24  patent, 24:43-54. The latter includes a content identifier that identifies the content (e.g., the file

25  "warming.wav") and a system identifier that identifies the location of the content (e.g., the

26  server located at "FTP.InfoCast.net"). Id. Although the '327 patent indicates that the sending of

27  a resource identifier to the user (instead of a full-blown URL) may be preferred in certain low

28  bandwidth embodiments, the '327 patent also discloses embodiments where the URL is sent to

1    the user directly instead of a resource identifier. '327 patent, 1:44-52.

2          316.    Accordingly, the system disclosed in the '327 patent allows information and

3    content providers to take an active role in the distribution of information by, for example,

4    targeting particular users for receiving information and advertisements. In addition, the InfoCast

5    servers support mobility of the users of the system as the system maintains real-time location

6    information for each user. The system supports the transfer of information over the nodes of

7    many types of communication networks such as cellular data networks, local area networks, and

8    wide area networks. Thus, a user can connect to and communicate with the system through a

9    wide variety of methods (including wirelessly). '327 patent, 1:44 - 2:6.

10          317.    The '327 patent also discloses features that are particularly relevant to the claims

11    of the '716 patent. For example, the '327 patent discloses that the system initiates a

12    communication of data that identifies, among other things, the content as well as the location of

13    the content. The resource identifier included in an InfoBite message points to not only the

14    corresponding content, but also the location of the content. As an example, the '327 patent

15    discloses that a resource identifier, such as "FFFFFF," that is transmitted within an InfoBite

16    message may correspond, for example, to the URL

17    "FTP://FTP.InfoCast.net/stories/warming.wav". '327 patent, 24:43-54. The latter includes a

18    content identifier that identifies the content (e.g., the file "warming.wav") and a system

19    identifier that identifies the location of the content (e.g., the server located at

20    "FTP.InfoCast.net"). *Id.* Furthermore, the '327 patent in certain embodiments discloses

21    transmission of the URL itself as opposed to a resource identifier. '327 patent, 1:44-52. In such

22    embodiments, the InfoBite message explicitly includes not only a content identifier that

23    identifies the content (e.g., the file "warming.wav"), but also a system identifier that identifies

24    the location of the content (e.g., the server located at "FTP.InfoCast.net"). '327 patent, 1:44-52

25    and 24:43-54.

26          318.    The system of the '327 patent directs content corresponding to a content

27    identifier to a cell phone only upon receiving a request from the cell phone to do so. The '327

28    patent discloses that an InfoCast server may serve content to a user's client device upon

receiving a command to do so by the user's client device. '327 patent, 24:55-66.

319.    Moreover, the '327 patent discloses that information identifiers are configured for display on a mobile phone. For example, the '327 patent discloses that information identifiers such as a resource identifier (*e.g.*, the string "FFFFFF") or a URL (*e.g.*, "FTP://FTP.InfoCast.net/stories/warming.wav") include alphanumeric characters. One skilled in the art at the time of the priority date of the '716 patent would readily appreciate that mobile phones could display alphanumeric characters.

320.    The '327 patent teaches paging calls indicating the time during which media content is available. For example, the '327 patent discloses that an InfoBite may include a validity period (e.g., of 30 minutes) during which the InfoBite remains in the client system. '327 patent, 8:28-29 and Figure 4. After an InfoBite is removed from the user's device, the corresponding content is no longer available to that device (because the resource identifier for the content, which is part of the InfoBite message, is necessarily removed as well).

321.    The '327 patent teaches causing content to change without sending a cell phone a notification and thereafter causing the changed content to be transmitted to a cell phone. The '327 patent discloses that: (i) InfoCast server A 17 may transmit to the user detailed content requested by the user that corresponds to an InfoBite earlier sent to that user. '327 patent, 24:55-25:13; and (ii) such detailed content may have been updated by InfoCast server A 17 based on updates received from external sources (*i.e.*, the "content providers" of the '327 patent). '327 patent, 6:46-7:15. Therefore, one skilled in the art would readily appreciate that the detailed content transmitted to a user in connection with an earlier InfoBite received by that user may be updated content.

322.    PNI is informed and believed, and thereupon alleges, that *Rover Toolkit* was published in December 1995 in connection with the Association for Computing Machinery's ("ACM") Special Interest Group on Operating Systems' ("SIGOPS") Fifteenth ACM Symposium on Operating Systems Principles in (i) ACM SIGOPS Operating Systems Review, Volume 29, Issue 5 (December 1995), and (ii) SOSP'95 Proceedings of the Fifteenth ACM Symposium on Operating Systems Principles, ACM (1995).

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

62

323.   *Rover Toolkit* qualifies as prior art for the '716 patent under 35 U.S.C. § 102(b).

324.   *Rover Toolkit* was not cited by the Applicant during prosecution or used by the Examiner in making any rejections during prosecution.

325.   HPL is in possession of a copy of the *Rover Toolkit* article as a result of reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of the contents of *Rover Toolkit*.

326.   *Rover Toolkit* discloses a system and methods for overcoming the major limitations of mobile communication systems that otherwise apply to mobile "roving" computers. Col. 1, p. 156 of *Rover Toolkit*.  For example, the Rover system allows building of interactive applications that isolate a user of a mobile host from the loss of network connectivity and from limited network bandwidth.  This is accomplished by either delivery of requested information immediately if the information is available in the local Rover cache of the mobile host or by queuing a request for such information from a Rover server and returning to a state in which the user may continue to interact with the system (i.e., without the system being hung until the requested information arrives).  Col. 1, p. 157 of *Rover Toolkit*.

327.   In the latter case, the user is notified when the information arrives from the Rover server (e.g., because of a restoration or temporary restoration of network connectivity). "Thus, a user can 'click ahead' of the communication channel, and expect a stream of responses as they become available.  In addition, forms and other interactive components that are typically implemented with server scripts can be downloaded for local execution.  Submitting a form is also implemented asynchronously, and a user can proceed even if the mobile host is disconnected. Form responses are delivered as they are received." *Id.*

328.   *Rover Toolkit* in particular discloses a paging or content notification system that it implements in connection, for example, with its e-mail services:

> The access manager also handles connection requests from servers. This is particularly useful when establishing a network connection is a costly operation. For example, an E-mail service could send a pager message to a disconnected mobile host when incoming E-mail is received. The mobile host would then initiate a network connection (e.g., by placing a cellular call) and retrieve the messages. The key advantage is that the mobile host does not

have to perform an expensive polling operation to receive timely updates.

Col. 1, p. 157 of *Rover Toolkit*.

329. *Rover Toolkit* discloses that it implements its functionality through relocatable dynamic objects ("RDOs") and queued remote procedure calls ("RPCs"):

> The Rover toolkit provides mobile application developers with a set of tools to isolate mobile applications from the limitations of mobile communication systems. The Rover toolkit provides mobile communication support based on two ideas: relocatable dynamic objects (RDOS) and queued remote procedure call (QRPC). A relocatable dynamic object is an object with a well-defined interface that can be dynamically loaded into a client computer from a server computer (or vice versa) to reduce client-server communication requirements. Queued remote procedure call is a communication system that permits applications to continue to make non-blocking remote procedure calls [6] even when a host is disconnected: requests and responses are exchanged upon network reconnection.

Col. 2, p. 156 of *Rover Toolkit*.

330. *Rover Toolkit* discloses that email messages are parts or components of relocatable dynamic objects ("RDOs"), which may be fetched by the mobile host from the Rover server during periods of network connectivity:

> Applications decide which objects to prefetch. The usability of Rover will be critically dependent upon simple user interface metaphors for indicating collections of objects to be prefetched. Requiring users to directly list the names of objects that they wish to prefetch is inherently confusing and error-prone. Instead, Rover client applications provide the access manager with prioritized prefetch lists based upon high-level user actions. For example, Rover Exmh automatically generates prefetch operations for the user's inbox folder and recently received messages. It also prefetches additional folders and messages based upon observed user behavior or user selection.

Col. 2, p. 161 of *Rover Toolkit*.

> Rover Exmh is organized as follows. The core of the browser is unchanged from Exmh and is implemented as Tcl/Tk scripts. Exmh's file system-based interface to the E-mail message handling system, mh, was replaced with an object-based interface, which is contained in RDOS retrieved from an HTTP server when the user first loads the browser. The browser imports the user's inbox (as an RDO) and list of recently visited folders (also as an RDO). After the list RDO is imported, it automatically issues prefetching import operations for each of the folders on the list. When the user selects a message for viewing, if it is not already

ANSWER, DEFENSES, FIRST COUNTERCLAIM, AMENDED SECOND COUNTERCLAIM, AND JURY DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

64

present, it is imported from the server and marked as loading in the folder display. The messages' states are updated as the messages arrive and become ready for viewing. The browser's interface runs entirely on the client, so that button clicks and typing result only in local method invocations, and are not exported to the server until after the user is done. This effectively demonstrates the value of RDOs for reducing client dependence on connectivity and bandwidth.

Col. 1, p. 165 of *Rover Toolkit*.

331. *Rover Toolkit* indicates that its objects (Relocatable Dynamic Objects (RDOs)) are identified using unique object identifiers that are Universal Resource Names ("URNS"):

Our initial implementation of Rover permits applications full access to the objects of the World-Wide Web (WWW) [4]. Objects are named using Universal Resource Names (URNS) [52] and our implementation is fully compatible with the HyperText Transport Protocol (HTTP) [5]. Our research prototype is modular, and favors ease of implementation and experimentation over performance, The Rover toolkit supports several transport protocols (e.g., HTTP and Simple Mail Transport Protocol (SMTP) [45]) over various communication media (e.g., Ethernet, WaveLAN, and phone lines). SMTP allows Rover to exploit E-mail for queued communication. We have developed three Rover-based applications: an E-mail reader, a calendar program, and a WWW browser proxy that provides two non-blocking versions of common WWW browsers. These applications are representative of the set that mobile users are likely to use. In these applications, RDOS are downloaded into the client and executed to reduce communication requirements, and server requests are queued for asynchronous processing.

Col. 2, p. 156 of *Rover Toolkit*.

Rover objects are named by unique object identifiers, which are URNs in our prototype. Servers store RDOs, which are objects with well-defined interfaces that can be dynamically relocated from the server to the client, or vice versa. An RDO might be as simple as a calendar item with its associated operations or as complex as a module that encapsulates part of an application (e.g., the user interface of a calendar tool). These more complex RDOs may create a thread of control when they are imported. The safe execution of RDOs is ensured by executing them in a controlled environment.

Col. 2, p. 158 of *Rover Toolkit*.

332. *Rover Toolkit* further discloses that a URN, apart from naming a RDO as set forth above, corresponds to a URL specifying an application of the Rover server (e.g., e-mail, browser or calendar), and a message body containing the RDO request method and an

authenticator:

> The upper portion of Rover's transport layer converts Rover URNS into an HTTP POST message with a URL specifying the server application (e.g., http://www.pdos.lcs.mit.edu/cgibin/rover/e-mail) and a message body containing the RDO request method and an authenticator.

Col. 2, p. 164 of *Rover Toolkit*.

333.    *Rover Toolkit* discloses that a RDO that includes an incoming email message for a mobile host is identified by a URN that also identifies the Rover server where that email message is stored (e.g., the URL component www.pdos.lcs.mit.edu). The Transport Layer converts this URN into a URL during transmission of the request message for the Rover object (RDO).

334.    *Rover Toolkit* discloses that wireless technologies, including pagers and PCS phones, may be used for communications between the mobile host and the Rover server:

> The split-phase communication model offered by QRPC provides several key benefits, including the ability to use separate or different communication channels for the request and response and allowing the communication channel to be closed during the intervening period. Several existing and new wireless technologies offer asymmetric communication options, such as receive-only pagers and PCS phones that can initiate calls, but cannot receive them. By splitting the request and response pair, communication can be directed over the most efficient, available channel. Closing the channel while waiting is particularly useful when the expectation is that the waiting period will be fairly long (e.g., due to server load or operation complexity) and that the client is charged for use of the channel based upon connection time.

Col. 2, p. 159 of *Rover Toolkit*.

> Wireless connectivity may provide a fallback mode of operation for any objects that were not prefetched during a previous period of connectivity.

Col. 1, p. 162 of *Rover Toolkit*.

335.    PNI is informed and believes, and thereupon alleges, that the *Rover Mosaic* reference was published in June 1995.

336.    *Rover Mosaic* qualifies as prior art for the '716 patent under 35 U.S.C. § 102(b).

337.    The *Rover Mosaic* reference was not cited by the Applicant during prosecution or

1    used by the Examiner in making any rejections during prosecution.

2        338.    HPL is in possession of a copy of *Rover Mosaic* as a result of reexamination

3    proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of

4    the contents of *Rover Mosaic*.

5        339.    *Rover Mosaic* describes the same system as that of Rover Toolkit discussed

6    above. *See* p. 6 of *Rover Mosaic* (stating that "[t]he problem of mobile connectivity is addressed

7    in a general sense by MIT's Rover project" and citing in footnote 14 to *Rover Toolkit*).  Rover

8    Mosaic discloses the use, for example, of pictures, video and sound data. P.9 of *Rover Mosaic*.

9    Rover Mosaic also discloses that the Rover server serves documents requested by the Rover

10   server, and that "[i]n some cases, a document actually comes with an explicit expiration date,

11   before which it is (weakly) guaranteed not to change significantly."  P.12 of *Rover Mosaic*.

12       340.    *Rover Mosaic* also discloses the use of cellular phone connections:

13           The problem of mobile connectivity is addressed in a general
             sense by MIT's Rover project [14]. Current research focuses on
14           ways to more efficiently use communications channels which
             have very low bandwidth, and/or which may not be available (or
15           have the same bandwidth) at all times. "Dockable" notebook
             computers and those with infrared, microwave or *cellular phone*
16           *connections* fit this description. Rover attempts to optimize these
             channels by supplementing standard protocols with Queued
17           Remote Procedure Calls (QRPC) and Dynamic Relocatable
             Objects.
18
*Rover Mosaic* at 6 (emphasis added).
19
         341.    The *Always On* article was published on September 29, 1996.
20
         342.    As such, the *Always On* article qualifies as prior art for the '716 patent under 35
21
     U.S.C. § 102(a).
22
         343.    The *Always On* article not cited by the Applicant during prosecution or used by
23
     the Examiner in making any rejections during prosecution.
24
         344.    HPL is in possession of a copy of the *Always On* article as a result of
25
     reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has
26
     specific knowledge of the contents of the *Always On* article.
27
         345.    The *Always On* article by Tso et al. addresses three topics with regard to mobile
28

computing. First, the article finds that narrowband data messaging (such as paging) is important in making data "pushing" applications financially viable. Second, it proposes modifications to the Windows communications infrastructure to integrate wireless data pipes with existing PC (personal computer) API's (Application Programming Interface). Third, it sets out a new transport protocol, which adds advanced data capabilities to narrowband wireless messaging networks, as well as provides a familiar sockets interface that hides applications from the differences in networks (*e.g.* 2 way paging and GSM's SMS appear the same to the application).

346.    In addition, the *Always On* article states that in addition to broadband media, a widely deployed, inexpensive wireless medium is required as the notification channel to implement data pushing economically. It is desired that the medium be reliable (*i.e.*, at least include acknowledgement), and provide some store and forward capabilities. The Always On article states that the authors believe that a class of narrowband messaging solutions (*e.g.*, Short Messaging Service (SMS) in digital cellular networks, and US NB-PCS (Personal Communication System) meets these requirements.

347.    RFC 1911 was published in February 1996.

348.    As such, RFC 1911 qualifies as prior art for the '838 patent under 35 U.S.C. § 102(b).

349.    RFC 1911 was not cited by the Applicant during prosecution or used by the Examiner in making any rejections during prosecution.

350.    HPL is in possession of a copy of RFC 1911 as a result of reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of the contents of RFC 1911.

351.    RFC 1911 proposes a standardized interface for communication between voice messaging systems. It describes a common format that can be used for one communication system to transmit a digital representation of a voice message to another communication system in a similar way to the representation of written text messages as electronic mail.  RFC 1911 intends to implement its system on TCP/IP networks, such as that used by the Internet, and other local- and wide-access networks. It specifically mentions implementations that support both

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

68

general-purpose computers having e-mail or other messaging functionality, and special-purpose computers that lack traditional e-mail functionality.

352.    RFC 1487 was published in July 1993.

353.    As such, RFC 1487 qualifies as prior art for the '838 patent under  35 U.S.C. § 102(b).

354.    RFC 1487 was not cited by the Applicant during prosecution or used by the Examiner in making any rejections during prosecution.

355.    HPL is in possession of a copy of RFC 1487 as a result of reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of the contents of RFC 1487.

356.    RFC 1487 proposes a communication protocol to use between a directory service client and a directory service server. In this context, a "directory service" refers to a set of services described by the X.500 standard, which provide for the lookup of information in an ordered data system called a directory. The existing X.500 standard, while fully-featured, has requirements beyond those necessary for many simple applications. RFC 1487 addresses this drawback by providing a simple set of read/write commands for accessing directories suitable to these types of applications.

357.    The '449 patent issued on May 26, 1992.

358.    As such, the '449 patent qualifies as prior art for the '838 patent under 35 U.S.C. § 102(b).

359.    The '449 patent was cited during prosecution but was not considered by the Examiner during prosecution of the '838 patent.

360.    HPL is in possession of a copy of the '449 patent as a result of reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of the contents of the '449 patent.

361.    The '449 patent provides for combined paging and radiotelephone functions in a single handset in a cellular mobile telecommunication network. The combined handset provides a variety of alerts to inform the user of the handset that an event has occurred. These alerts

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

69

1    include an audible alert and a vibration alert.

2        362.    The '305 patent issued on October 19, 1993.  As such, the '305 patent qualifies

3    as prior art for the '838 patent under 35 U.S.C. § 102(b).

4        363.    The '305 patent was not cited by the Applicant during prosecution or used by the

5    Examiner in making any rejections during prosecution.

6        364.    HPL is in possession of a copy of the '305 patent as a result of reexamination

7    proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of

8    the contents of the '305 patent.

9        365.    The '305 patent provides for a voice recognition capability installed on general-

10   purpose computing hardware that can be implemented in, among other environments, voice

11   messaging, call processing, and interactive voice response.  *See* Abstract. A user of the

12   telecommunication system can input voice commands to the voice recognition system that will

13   result in "queries" being transmitted to the system.  *See* 12:33-60.  This query can then be

14   translated into an action to be performed by the telecommunication system.

15       366.    The '845 patent was filed on June 4, 1996.

16       367.    As such, the '845 patent qualifies as prior art for the '838 patent under 35 U.S.C.

17   § 102(e).

18       368.    The '845 patent was not cited by the Applicant during prosecution or used by the

19   Examiner in making any rejections during prosecution.

20       369.    HPL is in possession of a copy of the '845 patent as a result of reexamination

21   proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of

22   the contents of the '845 patent.

23       370.    The '845 patent provides for a mobile telephone system to store in a subscriber

24   profile database a subscriber profile that includes, among other things, a schedule on the

25   subscriber's preferences for how calls or other information should be routed to the user. This

26   information can be updated by the user as it changes. When a call is placed or a text message

27   sent to the subscriber using the mobile network, the mobile network queries the subscriber

28   database to determine the user's location. If the information in this database is updated, a query

1    for the subscriber's information will return the up-to-date information on the user's preferences

2    rather than the old, out-of-date information.

3           371.    The '067 patent was filed on October 31, 1997.

4           372.    As such, the '067 patent qualifies as prior art for the '838 patent under 35 U.S.C.

5    § 102(e).

6           373.    The '067 patent was not cited by the Applicant during prosecution or used by the

7    Examiner in making any rejections during prosecution.

8           374.    HPL is in possession of a copy of the '067 patent as a result of reexamination

9    proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of

10   the contents of the '067 patent.

11          375.    The '067 patent provides for a mobile network handset that stores a subscriber's

12   account credit on the mobile handset.  When a call is placed to the mobile network, the credit

13   information is transmitted to a billing prepayment node to verify the sufficiency of the user's

14   funds. In the event that a user has insufficient funds for performing the requested mobile

15   network function, the user is notified by a voice mail message over the cellular network that

16   funds are insufficient.  *See* '067 patent, 4:12-18.

17          376.    The '382 patent issued on October 31, 1995.

18          377.    As such, the '382 patent qualifies as prior art for the '838 patent under 35 U.S.C.

19   § 102(b).

20          378.    The '382 patent was not cited by the Applicant during prosecution or used by the

21   Examiner in making any rejections during prosecution.

22          379.    HPL is in possession of a copy of the '382 patent as a result of reexamination

23   proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of

24   the contents of the '382 patent.

25          380.    The '382 patent provides for an acknowledge-back pager that notifies a paging

26   system whether the handset has sufficient memory available to receive a page when a new page

27   is available for the pager.  The pager includes programming to monitor available memory since

28   a user may opt to preserve already-received pages in memory so that they are not automatically

1   deleted when new pages arrive.  A new page is compared to the amount of memory available on

2   the pager, and if space is not sufficient, an appropriate acknowledgement is sent.  If the space is

3   sufficient, a request for the message is sent.

4        381.   The '616 patent issued on April 1, 1995.

5        382.   As such, the '616 patent qualifies as prior art for the '838 patent under 35 U.S.C.

6   § 102(b).

7        383.   The '616 patent was not cited by the Applicant during prosecution or used by the

8   Examiner in making any rejections during prosecution.

9        384.   HPL is in possession of a copy of the '616 patent as a result of reexamination

10   proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of

11   the contents of the '616 patent.

12        385.   The '616 patent discloses and discusses an ordinary GSM cellular mobile

13   telecommunications system and network, and additionally discloses improvements to that

14   network.  The '616 patent provides for automatic callback in a cellular mobile

15   telecommunication network even in cases in which a calling subscriber or a called subscriber

16   has/have traveled a long distance in the network from the time of initiating the callback service

17   to the time at which the service is carried out.  The '616 patent stores the location identity

18   characters of the two (calling and called) subscribers in an existing central database in the

19   mobile telecommunication network.

20        386.   The central database in the '616 patent, which is known as the home location

21   register (HLR), maintains a record of the whereabouts in the network of all mobile units that are

22   registered in the system and are located in the network at that moment in time. This is made

23   possible by connecting the HLR to all local databases, known as visitor location registers

24   (VLRs), in which there is stored a traffic area code which discloses the geographic positions of

25   the mobile units at each moment in time.

26        387.   The '616 patent provides the ability of the HLR to know in which VLR(s) all

27   mobile units are registered. This enables calls to be connected even when the subscribers have

28   moved from a first VLR to a second VLR in the time lapse between initiating callback and

1    executing callback.  *See* '616 patent, 2:1-35.

2          388.    The '824 patent to Lu et al. was filed on August 30, 1996 as a continuation of an

3    application that had been filed on May 4, 1995.

4          389.    The '824 patent issued on October 6, 1998.

5          390.    As such, the '824 patent qualifies as prior art for the '838 patent under 35 U.S.C.

6    § 102(e).

7          391.    HPL is in possession of a copy of the '824 patent as a result of reexamination

8    proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of

9    the contents of the '824 patent.

10         392.    The '824 patent was not cited by the Applicant during prosecution or used by the

11   Examiner in making any rejections during prosecution.

12         393.    The '824 patent discloses a private multiplexing cel'824lar network for mobile

13   stations that is coupled to the public cellular network, which may be a GSM network. *See* '824

14   patent, 8:27-47 and 2:16-41. The '824 patent discloses that both the public and private cellular

15   networks have respective home location registries that keep track of mobile stations authorized

16   and registered in the networks and that contain information on the mobile stations, such as their

17   respective telephone numbers. *See* '824 patent, 11:6-12; 10:46-52; 6:62 – 7:10.

18         394.    The '824 patent also discloses that short messaging service, or SMS, is a standard

19   messaging service in GSM systems.  See '824 patent, 2:55-60; 3:57-61 and 24:34.

20         395.    The Jasinski '446 patent was filed on February 21, 1995 and issued on

21   September 10, 1996.  It was a continuation of Application Ser. No. 955,385, which was filed on

22   October 1, 1992 and subsequently abandoned.

23         396.    As such, the Jasinski '446 patent qualifies as prior art for the '838 patent under 35

24   U.S.C. § 102(b) and (e).

25         397.    The Jasinski '446 patent was not considered by the Examiner during prosecution

26   of the '838 patent; the '446 patent was disclosed by the Applicant along with a large volume of

27   other art during prosecution of the '838 patent's parent.

28         398.    HPL is in possession of a copy of the Jasinski '446 patent as a result of

1   reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has

2   specific knowledge of the contents of the Jasinski '446 patent.

3       399.   The Jasinski '446 patent describes a system for requesting and delivering

4   information to a wireless device. The Jasinski '446 patent explains that it is intended to be a

5   "convenient and simple method for subscribing to a plurality of information services." See '446

6   patent, 1:56-57. A user may access different information services, including services providing

7   stock market, restaurant, sports, traffic, and other information, on a subscription basis. In fact,

8   the Jasinski '446 patent claims the correlation of information with subscriber listings. '446

9   patent claim 13 (including "memory means coupled to the processing means for storing access

10  information relating to a subscription to at least a subset of the plurality of information service

11  providers by each of the plurality of selective call receivers").

12      400.   The '327 patent presents a new, non-cumulative technological teaching that was

13  not previously considered and discussed on the record during the prosecution of the application

14  that resulted in the '838 patent, and which renders the above claims of the '838 patent obvious.

15  As discussed above, the '327 was not submitted by the Applicant or identified by the Examiner

16  during prosecution of the application that led to the '838 patent.  PNI is therefore informed and

17  believes, and thereupon alleges, that the '327 patent and its technological teachings were not at

18  all considered and were not at all discussed on the record during prosecution of the application

19  that led to the '838 patent.

20      401.   More particularly, during prosecution of the application that led to the '838

21  patent, the Examiner provided the following Reasons for Allowance:

22        The prior art of record fails to teach or suggest in a
     communication system that includes a first system, a second
23        system, a base station, and a wireless communication device, a
     method, comprising: receiving, at the first system, a data
24        transmission from the second system, the data transmission
     including a system identifier that is associated with the second
25        system and an information identifier that is associated with
     information stored in the second system, wherein the information
26        is not included in the data transmission and is not stored in the
     wireless communication device, the first system having an
27        interface with a home location registry; generating a message
     which includes the system identifier and the information
28        identifier; transmitting, from the first system, the message to the

base station for transmission to the wireless communication device as cited in claims 54 and 61, and corresponding methods of claims 60 and 62; and a method of notifying a cellular phone of information available at a content storage and retrieval unit utilizing a notification system that includes a notification terminal controller coupled with an input/output controller comprising: receiving, at the notification system, a data transmission from the content storage and retrieval unit, the data transmission including a system identifier that is associated with the content storage and retrieval unit and an information identifier that is associated with information stored in the content storage and retrieval unit; the notification system having an interface with a home location registry; causing the notification system to relay a notification to the cellular phone that identifies the information and its location as claim 91 and its method of claims 124, 138 as well as a notification system of claim 145.

Notice of Allowance dated April 23, 2007, pp. 2-3.

402.     Tso discloses each of the elements identified in the examiner's reasons for allowance. For example, with regard to independent claims 1, 4, 7, 8 and 9, Tso discloses:

403.     A first system, a second system, a base station, and a wireless communication device. (*See* '327 patent at, *e.g.*,  Figure 1, 4:4-24, 8:65-9:7, 9:66-10:9, 13:16-25);

404.     Receiving, at the first system, a data transmission from the second system, the data transmission including a system identifier that is associated with the second system and an information identifier that is associated with information stored in the second system, wherein the information is not included in the data transmission and is not stored in the wireless communication device, the first system having an interface with a home location registry;

405.     Generating a message which includes the system identifier and the information identifier. (*See* '327 patent at, *e.g.*, 6:21-30, 7:30-39, 8:48-57, 9:24-64, 24:47-59); and

406.     Transmitting, from the first system, the message to the base station for transmission to the wireless communication device.  (*See* '327 patent at, *e.g.*, 3:49-4:42, 4:61-64, 11:19-26, 12:55-63, 15:19-22, 25:8-13, 25:25-38).

407.     With regard to independent claims 38, 71, 85 and 92 of the '838 patent, Tso discloses, among other things:

408.     A method of notifying a cellular phone of information available at a content storage and retrieval unit utilizing a notification system that includes a notification terminal

1   controller coupled with an input/output controller.  (*See* '327 patent at, *e.g.*, 9:66-10:9, 13:16-

2   25, 6:48-7:9, 7:30-67);

3       409.    Receiving, at the notification system, a data transmission from the content

4   storage and retrieval unit, the data transmission including a system identifier that is associated

5   with the content storage and retrieval unit and an information identifier that is associated with

6   information stored in the content storage and retrieval unit. (*See* '327 patent at, *e.g.*, 6:21-30,

7   7:17-39, 8:1-4, 8:48-57, 8:65-9:7, 24:47-59);

8       410.    A notification system having an interface with a home location registry.  (*See*

9   '327 patent at, *e.g.*, 4:4-14, 16:24-43); and

10      411.    Causing the notification system to relay a notification to the cellular phone that

11  identifies the information and its location as claim 91 and its method of claims 124, 138 as well

12  as a notification system of claim 145. (*See* '327 patent at, *e.g.*, 7:30-39).

13      412.    In combination with the other teachings described for the other references

14  disclosed above with respect to the '838 patent, the '327 patent provides new and non-

15  cumulative technological teachings that were not previously considered and discussed on the

16  record during the prosecution of the application that resulted in the '838 patent, and which

17  render the claims of the '838 patent obvious.

18      413.    The '327 patent discloses or suggests all of the limitations of claims 1-30, 32, 34-

19  53, 55-57, 59-63, and 69-96 of the '838 patent.  As such, the '327 patent renders obvious under

20  35 U.S.C. § 103(a) these claims.

21      414.    The '327 patent presents a new, non-cumulative technological teaching that was

22  not previously considered and discussed on the record during the prosecution of the application

23  that resulted in the '838 patent. In particular, with respect, for example, to claim 9, no

24  combination of references was discussed on the record disclosing: (i) the content provider

25  initiating communication of data intended for the wireless communication device, the data

26  including an information identifier that is associated with information stored by the content

27  provider and identifies the location of the stored information, wherein the information is not

28  included in the data and is not already stored in the wireless communication device; (ii) the

1   content provider causing the content notification system to: process the data into a message

2   suitable for transmission to the wireless communication device, which message includes the

3   information identifier, and transmit the message to the wireless communication device; and (iii)

4   the content provider receiving a request message that is wirelessly transmitted from the wireless

5   communication device over the mobile radiotelephone network as a reply to the message, the

6   request message including at least a portion of the information identifier.

7      415.    PNI is informed and believes, and thereupon alleges, that the Examiner never

8   considered a reference or combination of references that discloses or suggest the combination of

9   features in (i), (ii) and (iii) above. The '327 patent discloses or suggests all of these features,

10  among others.

11     416.    The '327 patent thus presents a new, non-cumulative technological teaching

12  relating to claims 1-30, 32, 34-53, 55-57, 59-63, and 69-96 that were not previously considered

13  and discussed on the record during the prosecution of the application that resulted in the '838

14  patent.

15     417.    The combination of the '327 patent and the *Always On* article discloses all of the

16  limitations of claim 14 of the '838 patent.

17     418.    PNI is informed and believes, and thereupon alleges, that the Examiner never

18  considered a reference or combination of references disclosing the combination of features in

19  independent claim 9, from which claim 14 depends, as described above.

20     419.    A person of ordinary skill in the art would readily combine the respective

21  disclosures of the '327 patent and the *Always On* article to allow a radiotelephone network as

22  disclosed in the '327 patent to include at least cellular digital packet data system.

23     420.    PNI is informed and believes, and thereupon alleges, that Michael Man-Hak Tso

24  identified as the first inventor of the '327 patent is the same as Michael M. Tso, identified as the

25  first author of the Always On article.  The named inventors of the '327 patent (Michael Man-

26  Hak Tso; David Alfred Romrell; Daniel Joshua Gillespie) are the same individuals listed as the

27  authors of the *Always On* article (Michael M. Tso; Daniel J. Gillespie; David A. Romrell).

28     421.    Both the '327 patent and the *Always On* article discuss the InfoCast system and

InfoBites (*see*, *e.g.*, '327 patent, 2:64 - 3:7, 4:54 - 6:4; *Always On* article at pg. 922).

422. In particular, a person of ordinary skill in the art would look to the *Always On* article and understand that CDPD (Cellular Digital Packet Data) is a cellular digital packet data system that could be utilized with a radiotelephone network. A person of ordinary skill in the art would also be motivated to utilize the CDPD network with the system and method as disclosed in the '327 patent because the '327 patent discloses that it can be utilized with various networks and network protocols. *See*, *e.g.*, '327 patent, 17:15-17.

423. For at least these reasons, combining the respective features of the '327 patent and the *Always On* article is at most the mere application of known techniques to a known device ready for improvement to yield predictable results, rendering claim 14 unpatentable.

424. In addition, the claimed invention is a combination of known prior art elements that maintain their respective properties or functions after they have been combined. Therefore, the combination of the '327 patent and the *Always On* article renders claims 14 of the '838 patent obvious.

425. For similar reasons, with respect to claim 17 of the '838 patent, a person of ordinary skill in the art would readily combine the respective disclosures of the '327 patent and the *Always On* article to allow a radiotelephone network as disclosed in the '327 patent to include at least a personal communications services (PCS) system.

426. In particular, a person of ordinary skill in the art would know that the '327 patent discloses the use of the GSM network's short message service (SMS) to broadcast at a cell level. In addition to carrying InfoBites, SMS broadcasts as disclosed in the '327 patent can also carry information to update a client resource database, a client content database, and the client configuration of client A 23. (*See*, *e.g.*, '327 patent, 2:64 - 3:7, 4:54 - 6:4; Always On article at pg. 922).

427. A person of ordinary skill in the art would also be motivated to utilize the PCS as disclosed in Tso for the same or substantially same reasons, as the *Always On* article identifies both SMS and PCS as narrowband messaging solutions to implement data pushing economically, which is one of the features of the '327 patent. *See*, *e.g.*, '327 patent, 1:58-62.

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

78

428.    The combination of the '327 patent and RFC 1911 discloses all of the limitations of claim 54 of the '838 patent.  The combination of the '327 patent and RFC 1911 renders dependent claim 54 obvious, particularly since dependent claim 54 depends from independent claim 38.  The combination of the '327 patent and RFC 1911 discloses these recited features, among others.

429.    Accordingly, the combination of the '327 patent and RFC 1911 teaches a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that resulted in the '838 patent.

430.    A person of ordinary skill in the art would readily combine the respective disclosures of the '327 patent and RFC 1911.  The '327 patent discloses a system where multiple InfoCast servers transmitting notifications of audio recording, including summary information, interoperate.  RFC 1911 discloses a protocol used for handling the interoperation of systems handling recorded audio messaging.  This would be readily apparent to a person of ordinary skill in the art, particularly since each of the '327 patent and RFC 1911 pertain to interfaces between server components operating in a network where audio messages are being sent from and to various end users.

431.    For at least these reasons, combining the respective features of the '327 patent and RFC 1911 is at most the mere application of known techniques to a known device ready for improvement to yield predictable results, rendering claim 54 obvious.

432.    In addition, the claimed invention is a combination of known prior art elements that maintain their respective properties or functions after they have been combined.

433.    Additionally, RFC 1911 is a standardized solution used to address the intercommunication of servers handling voice data, and as such it would be "obvious to try" the Voice Profile for Internet Mail of RFC 1911 as one of a finite number of solutions to interconnect the multiple InfoCast servers of the '327 patent.

434.    Therefore, the combination of the '327 patent and RFC 1911 article renders claim 54 of the '838 patent obvious.

435.    The combination of the '327 patent and RFC 1487 discloses all of the limitations

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

79

of claim 54 of the '838 patent.

436.    The combination of the '327 patent and RFC 1487 discloses these recited features, among others.  Accordingly, the combination of the '327 patent and RFC 1487 teaches a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that resulted in the '838 patent.

437.    A person of ordinary skill in the art would readily combine the respective disclosures of the '327 patent and RFC 1487.  The '327 patent discloses a system where an InfoCast server looks up location information for a specific subscriber in a location database. RFC 1487 discloses a protocol used for simple accessing and recording of directory information, such as the location for a specific recipient identification.  This would be readily apparent to a person of ordinary skill in the art, particularly since each of the '327 patent and RFC 1487 pertain to accessing lookup information for specific entities in a network.

438.    For at least these reasons, combining the respective features of the '327 patent and RFC 1487 is at most the mere application of known techniques to a known device ready for improvement to yield predictable results, rendering claim 58 unpatentable.

439.    Additionally, RFC 1487 is a standardized solution used to locate information on a specific entity from a server, and as such it would be "obvious to try" LDAP as described in RFC 1487 as one of a finite number of solutions to provide an interface to the location registry of the '327 patent.

440.     In addition, the claimed invention is a combination of known prior art elements that maintain their respective properties or functions after they have been combined.

441.    Therefore, the combination of the '327 patent and RFC 1487 renders claim 58 of the '838 patent obvious.

442.    The combination of the '327 patent and the '449 patent discloses all of the limitations of claims 31 and 33 of the '838 patent. As discussed earlier, the prosecution history makes clear that the Examiner allowed independent claim 7 of the '838 patent because, in the Examiner's view, the considered prior art did not disclose the combination of features recited in that claim.

443.    The combination of the '327 patent and the '449 patent discloses these recited features, among others.  Accordingly, the combination of the '327 patent and the '449 patent teaches a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that resulted in the '838 patent.

444.    A person of ordinary skill in the art would readily combine the respective disclosures of the '327 patent and the '449 patent to include in the system disclosed in the '327 patent alternative alerts such as audible alerts or a vibration alert as disclosed in the '449 patent. This would be readily apparent to a person of ordinary skill in the art, particularly since each of the '327 patent and the '616 patent pertain to cellular mobile devices in GSM systems, and the mobile cellular radiotelephone disclosed in the '449 patent is operable in the GSM system disclosed by the '327 patent, allowing the mobile radiotelephone of the '449 patent to be readily combined with the GSM system of the '327 patent.

445.    For at least these reasons, combining the respective features of the '327 patent and the '449 patent is at most the mere application of known techniques to a known device ready for improvement to yield predictable results, rendering claims 31 and 33 unpatentable.

446.    In addition, the claimed invention is a combination of known prior art elements that maintain their respective properties or functions after they have been combined.

447.    Therefore, the combination of the '327 patent and the '449 patent renders claims 31 and 33 of the '838 patent obvious.

448.    The combination of the '327 patent and the '305 patent discloses all of the limitations of claims 67 and 68 of the '838 patent.

449.    The combination of the '327 patent and the '305 patent discloses these recited features, among others. Accordingly, the combination of the '327 patent and the '305 patent teaches a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that resulted in the '838 patent.

450.    A person of ordinary skill in the art would readily combine the respective disclosures of the '327 patent and the '305 patent to include in the system disclosed in the '327 patent the additional option of selecting InfoActions to perform using voice commands as

1   disclosed in the '305 patent. This would be readily apparent to a person of ordinary skill in the

2   art, particularly since each of the '327 patent and the '305 patent pertain to providing data

3   retrieval servers for devices in cellular networks.

4           451.    For at least these reasons, combining the respective features of the '327 patent

5   and the '305 patent is at most the mere application of known techniques to a known device

6   ready for improvement to yield predictable results, rendering claims 67 and 68 unpatentable.

7           452.    In addition, the claimed invention is a combination of known prior art elements

8   that maintain their respective properties or functions after they have been combined.

9           453.    Therefore, the combination of the '327 patent and the '449 patent renders claims

10  67 and 68 of the '838 patent obvious.

11          454.    The combination of the '327 patent and the '845 patent discloses all of the

12  limitations of claim 64 of the '838 patent.

13          455.    The combination of the '327 patent and the '845 patent discloses these recited

14  features, among others.  Accordingly, the combination of the '327 patent and the '845 patent

15  teaches a new, non-cumulative technological teaching that was not previously considered and

16  discussed on the record during the prosecution of the application that resulted in the '838 patent.

17          456.    A person of ordinary skill in the art would readily combine the respective

18  disclosures of the '327 patent and the '845 patent to include in the system disclosed in the '327

19  patent the handling of updates to entries in the notification system as disclosed in the '845

20  patent.  This would be readily apparent to a person of ordinary skill in the art, particularly since

21  each of the '327 patent and the '845 patent both pertain to the handling of subscriber data in

22  cellular networks. Both the '327 patent and the '845 patent disclose standard configurations of

23  mobile networks, *e.g.* '327 patent, 2:54-4:33; '845 patent, 5:13-6:4.  Both the '327 patent and

24  the '845 patent disclose modes of operating subscriber location features in mobile networks,

25  *e.g.*, '327 patent, 4:33-53, 16:24-20:53; '845 patent 1:20-2:43, 9:63-10:44.  Both the '327 patent

26  and the '845 patent store subscriber profiles indicating information about how and where

27  subscriber information should be delivered.

28          457.    For at least these reasons, combining the respective features of the '327 patent

1  and the '845 patent is at most the mere application of known techniques to a known device

2  ready for improvement to yield predictable results, rendering claim 64 unpatentable.

3       458.    In addition, the claimed invention is a combination of known prior art elements

4  that maintain their respective properties or functions after they have been combined.

5       459.    Therefore, the combination of the '327 patent and the '845 patent renders claim

6  64 of the '838 patent obvious.

7       460.    The combination of the '327 patent and the '382 patent discloses all of the

8  limitations of claim 65 of the '838 patent.

9       461.    The combination of the '327 patent and the '382 patent discloses these recited

10  features, among others.  Accordingly, the combination of the '327 patent and the '382 patent

11  teaches a new, non-cumulative technological teaching that was not previously considered and

12  discussed on the record during the prosecution of the application that resulted in the '838 patent.

13       462.    A person of ordinary skill in the art would readily combine the respective

14  disclosures of the '327 patent and the '382 patent to include in the system disclosed in the '327

15  patent the messaging protocol of the '382 patent to prevent the transmission of data larger than

16  the available memory of the client of the '327 patent. This would be readily apparent to a person

17  of ordinary skill in the art, particularly since each of the '327 patent and the '067 patent both

18  pertain to preserving limited memory on mobile devices by transmitting first a limited

19  notification followed by a request for the message itself.

20       463.    For at least these reasons, combining the respective features of the '327 patent

21  and the '382 patent is at most the mere application of known techniques to a known device

22  ready for improvement to yield predictable results, rendering claim 65 unpatentable.

23       464.    In addition, the claimed invention is a combination of known prior art elements

24  that maintain their respective properties or functions after they have been combined.

25       465.    Therefore, the combination of the '327 patent and the '382 patent renders claim

26  65 of the '838 patent obvious.

27       466.    The combination of the '327 patent and the '067 patent discloses all of the

28  limitations of claim 66 of the '838 patent.

467.   The combination of the '327 patent and the '067 patent teaches a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that resulted in the '838 patent.

468.   A person of ordinary skill in the art would readily combine the respective disclosures of the '327 patent and the '067 patent to include in the system disclosed in the '327 patent the billing protocol disclosed in the '067 patent, including notification of insufficiency of user funds. This would be readily apparent to a person of ordinary skill in the art, particularly since each of the '327 patent and the '067 patent both pertain to the handling of subscriber data in cellular networks, *e.g.* '327 patent, 4:33-53, 16:24-20:53; '067 patent at 2:59-69, and both address the handling of billing for users of those systems, *e.g.*, '327 patent, 10:62-66; '067 patent, 4:12-18.

469.   For at least these reasons, combining the respective features of the '327 patent and the '067 patent is at most the mere application of known techniques to a known device ready for improvement to yield predictable results, rendering claim 66 unpatentable.  In addition, the claimed invention is a combination of known prior art elements that maintain their respective properties or functions after they have been combined.   Therefore, the combination of the '327 patent and the '067 patent renders claim 66 of the '838 patent obvious.

470.   The combination of the '327 patent and the '616 patent  renders obvious all of the limitations of claims 9-20 of the '838 patent. The combination of the '327 patent and the '616 patent presents a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that resulted in the '838 patent.

471.   PNI is informed and believes, and thereupon alleges, that the Examiner never considered a reference or combination of references disclosing the combination of features in independent claim 9, as described above.  The combination of the '327 patent and the '616 patent discloses these recited features, among others. Accordingly, the combination of the '327 patent and the '616 patent provides a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

84

1    resulted in the '838 patent.

2         472.    A person of ordinary skill in the art would readily combine the respective

3    disclosures of the '327 patent and the '616 patent to include in the system disclosed in the '327

4    patent a Home Location Register as disclosed in the '616 patent.  This would be readily

5    apparent to a person of ordinary skill in the art, particularly since each of the '327 patent and the

6    '616 patent pertain to GSM systems, and the Home Location Register disclosed in the '616

7    patent is a known GSM network element.  Moreover, since both the '327 patent and the '616

8    patent pertain to GSM systems, the network architectures of the two patents are compatible so

9    as to allow the Home Location Register disclosed in the '616 patent to be readily combined with

10   the GSM system as disclosed in the '327 patent, as set forth in the claim chart above.

11        473.    For at least these reasons, combining the respective features of the '327 patent

12   and the '616 patent is at most the mere application of known techniques to a known device

13   ready for improvement to yield predictable results, rendering claims 9-20 unpatentable.  In

14   addition, the claimed invention is a combination of known prior art elements that maintain their

15   respective properties or functions after they have been combined.  Therefore, the combination of

16   the '327 patent and the '616 patent renders claims 9-20 of the '838 patent obvious.

17        474.    The combination of the '327 patent, the '616 patent and the *Always On* article

18   discloses all of the limitations of claim 14 of the '838 patent.

19        475.    PNI is informed and believes, and thereupon alleges, that the Examiner never

20   considered a reference or combination of references disclosing each limitation of the allowed

21   claims of the '838 patent.  The '616 patent and the *Always On* article discloses these recited

22   features, among others.  Accordingly, the combination of the '327 patent, the '616 patent and

23   the *Always On* article provides a new, non-cumulative technological teaching that was not

24   previously considered and discussed on the record during the prosecution of the application that

25   resulted in the '838 patent.

26        476.    A person of ordinary skill in the art would readily combine the respective

27   disclosures of the '327 patent and the '616 patent as set forth above, with the *Always On* article

28   to allow a radiotelephone network as disclosed in the '327 patent to include at least a cellular

1    digital packet data (CDPD) system.  This would be readily apparent to a person of ordinary skill

2    in the art, particularly since each of the '327 patent and the *Always On* article pertain, at least in

3    part, to using an inexpensive wireless medium as the notification channel to implement data

4    pushing.

5         477.    A person of ordinary skill in the art would look to the *Always On* article and

6    understand that CDPD (Cellular Digital Packet Data) is a cellular digital packet data system that

7    could be utilized with a radiotelephone network. A person of ordinary skill in the art would also

8    be motivated to utilize the CDPD network with the system and method as disclosed in the '327

9    patent and the '616 patent because the '327 patent discloses that it can be utilized with various

10   networks and network protocols.  *See*, *e.g.*, '327 patent, 17:15-17.

11        478.    For at least these reasons, combining the respective features of the '327 patent,

12   the '616 patent and the *Always On* article is at most the mere application of known techniques to

13   a known device ready for improvement to yield predictable results, rendering claim 14

14   unpatentable.  In addition, the claimed invention is a combination of known prior art elements

15   that maintain their respective properties or functions after they have been combined.  Therefore,

16   the combination of the '327 patent, the '616 patent and the *Always On* article renders claims 14

17   of the '838 patent obvious.

18        479.    The combination of the '327 patent, the '616 patent and the *Always On* article

19   discloses the recited features that the Examiner found lacking in the prior art of record during

20   prosecution of the '838 patent, among others. Accordingly, the combination of the '327 patent,

21   the '616 patent and the *Always On* article provides a new, non-cumulative technological

22   teaching that was not previously considered and discussed on the record during the prosecution

23   of the application that resulted in the '838 patent.

24        480.    A person of ordinary skill in the art would readily combine the respective

25   disclosures of the '327 patent and the *Always On* article to allow a radiotelephone network as

26   disclosed in the '327 patent to include at least a personal communications services (PCS)

27   system, for the reasons already described above.

28        481.    *Rover Toolkit* presents a new, non-cumulative technological teaching that was

1   not previously considered and discussed on the record during the prosecution of the application

2   that resulted in the '838 patent, and which renders the above claims of the '838 patent obvious.

3   As discussed above, *Rover Toolkit* was not submitted by the Applicant or identified by the

4   Examiner during prosecution of the application that led to the '838 patent. Accordingly, *Rover*

5   *Toolkit* and its technological teachings were not at all considered and were not at all discussed

6   on the record during prosecution of the application that led to the '838 patent.

7          482.    The teachings of *Rover Toolkit* are also non-cumulative with respect to the

8   Examiner's Reasons for Allowance and the claims of the '838 patent.  During prosecution of the

9   application that led to the '838 patent, the Examiner provided the following Reasons for

10  Allowance:

11              The prior art of record fails to teach or suggest in a
                communication system that includes a first system, a second
12              system, a base station, and a wireless communication device, a
                method, comprising: receiving, at the first system, a data
13              transmission from the second system, the data transmission
                including a system identifier that is associated with the second
14              system and an information identifier that is associated with
                information stored in the second system, wherein the information
15              is not included in the data transmission and is not stored in the
                wireless communication device, the first system having an
16              interface with a home location registry; generating a message
                which includes the system identifier and the information
17              identifier; transmitting, from the first system, the message to the
                base station for transmission to the wireless communication
18              device as cited in claims 54 and 61, and corresponding methods of
                claims 60 and 62; and a method of notifying a cellular phone of
19              information available at a content storage and retrieval unit
                utilizing a notification system that includes a notification terminal
20              controller coupled with an input/output controller comprising:
                receiving, at the notification system, a data transmission from the
21              content storage and retrieval unit, the data transmission including
                a system identifier that is associated with the content storage and
22              retrieval unit and an information identifier that is associated with
                information stored in the content storage and retrieval unit; the
23              notification system having an interface with a home location
                registry; causing the notification system to relay a notification to
24              the cellular phone that identifies the information and its location
                as claim 91 and its method of claims 124, 138 as well as a
25              notification system of claim 145.

26  Notice of Allowance dated April 23, 2007, pp. 2-3.

27          483.    *Rover Toolkit* discloses each of these elements. For example, with regard to

28  independent claims 1, 4, 7, 8 and 9, *Rover Toolkit* discloses:

484.     A first system, a second system, a base station, and a wireless communication device. (*See Rover Toolkit* at, *e.g.*, Figure 1, page 161);

485.     Receiving, at the first system, a data transmission from the second system, the data transmission including a system identifier that is associated with the second system and an information identifier that is associated with information stored in the second system, wherein the information is not included in the data transmission and is not stored in the wireless communication device, the first system having an interface with a home location registry.  (*See Rover Toolkit* at, *e.g.*, pages 156, 159, 162 and 164);

486.     Generating a message which includes the system identifier and the information identifier.  (*See Rover Toolkit* at, *e.g.*, pages 156 and 164); and

487.     Transmitting, from the first system, the message to the base station for transmission to the wireless communication device.  (*See Rover Toolkit* at, *e.g.*, page 161).

488.     With regard to independent claims 38, 71, 85 and 92 of the '838 patent, *Rover Toolkit* discloses, among other things:

489.     A method of notifying a cellular phone of information available at a content storage and retrieval unit utilizing a notification system that includes a notification terminal controller coupled with an input/output controller. (*See Rover Toolkit* at, *e.g.*, Figure 1 and page 163);

490.     Receiving, at the notification system, a data transmission from the content storage and retrieval unit, the data transmission including a system identifier that is associated with the content storage and retrieval unit and an information identifier that is associated with information stored in the content storage and retrieval unit. (*See Rover Toolkit* at, *e.g.*, pages 156 and 164);

491.     Causing the notification system to relay a notification to the cellular phone that identifies the information and its location as claim 91 and its method of claims 124, 138 as well as a notification system of claim 145. (*See Rover Toolkit* at, *e.g.*, pages 156, 161 and 164).

492.     In combination with the other teachings described for the other references disclosed above with respect to the '838 patent, *Rover Toolkit* provides new and non-cumulative

1    technological teachings that were not previously considered and discussed on the record during

2    the prosecution of the application that resulted in the '838 patent, and which render the claims of

3    the '838 patent obvious.

4           493.    The combination of *Rover Toolkit*, *Rover Mosaic* and the '824 patent discloses

5    all of the limitations of claims 1-7, 9-16, 18-25, 27-32, 36 and 37 of the '838 patent.

6           494.    PNI is informed and believes, and thereupon alleges, that the Examiner never

7    considered a reference or combination of references disclosing the combination of features in

8    the allowed claims of the '838 patent, as described above.   The combination of *Rover Toolkit*,

9    *Rover Mosaic* and the '824 patent discloses these recited features, among others. Accordingly,

10   the combination of *Rover Toolkit*, *Rover Mosaic* and the '824 patent provides a new, non-

11   cumulative technological teaching that was not previously considered and discussed on the

12   record during the prosecution of the application that resulted in the '838 patent.

13          495.    A person of ordinary skill in the art would readily combine the respective

14   disclosures of *Rover Toolkit*, *Rover Mosaic* and the '824 patent as set forth above. This would

15   be readily apparent to a person of ordinary skill in the art, particularly since each of *Rover*

16   *Toolkit*, *Rover Mosaic* and the '824 patent pertain, at least in part, to using cellular networks to

17   provide information or content to users.

18          496.    For at least these reasons, combining the respective features of *Rover Toolkit*,

19   *Rover Mosaic* and the '824 patent is at most the mere application of known techniques to a

20   known device ready for improvement to yield predictable results, rendering claims 1-7, 9-16,

21   18-25, 27-32, 36 and 37 unpatentable.

22          497.    In addition, the claimed invention is a combination of known prior art elements

23   that maintain their respective properties or functions after they have been combined.

24          498.    Therefore, the combination of *Rover Toolkit*, *Rover Mosaic* and the '824 patent

25   renders claims 1-7, 9-16, 18-25, 27-32, 36 and 37of the '838 patent obvious.

26          499.    The combination of *Rover Toolkit*, *Rover Mosaic*, the '824 patent and the *Always*

27   *On* article discloses all of the limitations of claim 17 of the '838 patent.

28          500.    PNI is informed and believes, and thereupon alleges, that the Examiner never

considered a reference or combination of references disclosing the combination of features in independent claim 17, as described above.   The '824 patent and the *Always On* article discloses these recited features, among others. Accordingly, the combination of *Rover Toolkit*, *Rover Mosaic*, the '824 patent and the *Always On* article provides a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that resulted in the '838 patent.

501.    A person of ordinary skill in the art would readily combine the respective disclosures of *Rover Toolkit*, *Rover Mosaic*, the '824 patent and the *Always On* article as set forth above. This would be readily apparent to a person of ordinary skill in the art, particularly since each of *Rover Toolkit*, *Rover Mosaic*, the '824 patent and the *Always On* article pertain, at least in part, to using cellular networks to provide information or content to users.

502.    For at least these reasons, combining the respective features of *Rover Toolkit*, *Rover Mosaic*, the '824 patent and the *Always On* article is at most the mere application of known techniques to a known device ready for improvement to yield predictable results, rendering claim 17 unpatentable.

503.    In addition, the claimed invention is a combination of known prior art elements that maintain their respective properties or functions after they have been combined.

504.    Therefore, the combination of *Rover Toolkit*, *Rover Mosaic* and the '824 patent renders claim 17 of the '838 patent obvious.

505.    The combination of *Rover Toolkit*, *Rover Mosaic* and the '616 patent discloses all of the limitations of claims 8, 38-53, 59-63 and 69-96 of the '838 patent.

506.    PNI is informed and believes, and thereupon alleges, that the Examiner never considered a reference or combination of references disclosing the combination of features in the allowed claims of the '838 patent, as described above.  The combination of *Rover Toolkit*, *Rover Mosaic* and the '616 patent discloses these recited features, among others. Accordingly, the combination of *Rover Toolkit*, *Rover Mosaic* and the '616 patent provides a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that resulted in the '838 patent, and renders

1    obvious claims 8, 38-53, 59-63 and 69-96 of the '838 patent.

2         507.   A person of ordinary skill in the art would readily combine the respective

3    disclosures of *Rover Toolkit*, *Rover Mosaic* and the '616 patent as set forth above. This would

4    be readily apparent to a person of ordinary skill in the art, particularly since each of *Rover

5    Toolkit*, *Rover Mosaic* and the '616 patent pertain, at least in part, to using cellular networks to

6    provide information or content to users.

7         508.   For at least these reasons, combining the respective features of *Rover Toolkit*,

8    *Rover Mosaic* and the '616 patent is at most the mere application of known techniques to a

9    known device ready for improvement to yield predictable results, rendering claims 8, 38-53, 59-

10   63 and 69-96 unpatentable.

11        509.   In addition, the claimed invention is a combination of known prior art elements

12   that maintain their respective properties or functions after they have been combined.

13        510.   Therefore, the combination of *Rover Toolkit*, *Rover Mosaic* and the '616 patent

14   renders claims 8, 38-53, 59-63 and 69-96 of the '838 patent obvious.

15        511.   The combination of *Rover Toolkit*, *Rover Mosaic*, the '824 patent and the '449

16   patent discloses all of the limitations of claim 33 of the '838 patent.

17        512.   A person of ordinary skill in the art would readily combine the respective

18   disclosures of the *Rover Toolkit*, *Rover Mosaic*, the '824 patent and the '449 patent to include in

19   the system disclosed in *Rover Toolkit* and *Rover Mosaic* an alternative alert such as a vibration

20   alert as disclosed in the '449 patent.  This would be readily apparent to a person of ordinary skill

21   in the art, particularly since each of *Rover Toolkit* and *Rover Mosaic* pertain to cellular mobile

22   devices, and the mobile cellular radiotelephone disclosed in the '449 patent is operable in the

23   GSM system disclosed by the '616 patent, allowing the mobile radiotelephone of the '449 patent

24   to be readily utilized as a mobile unit as disclosed in *Rover Toolkit* and *Rover Mosaic*.

25        513.   For at least these reasons, combining the respective features of *Rover Toolkit*,

26   *Rover Mosaic*, the '824 Patent and the '449 Patent is at most the mere application of known

27   techniques to a known device ready for improvement to yield predictable results, rendering

28   claim 33 unpatentable.

514.    In addition, the claimed invention is a combination of known prior art elements that maintain their respective properties or functions after they have been combined.

515.    Therefore, the combination of Rover Toolkit, Rover Mosaic, the '824 patent and the '449 patent renders claim 33 of the '838 patent obvious.

516.    The combination of *Rover Toolkit*, *Rover Mosaic*, the '616 patent and RFC 1487 discloses all of the limitations of claim 58 of the '838 patent, particularly insofar as dependent claim 58 depends from independent claim 38.

517.    A person of ordinary skill in the art would readily combine the respective disclosures of the *Rover Toolkit*, *Rover Mosaic*, the '616 patent and RFC 1487.  *Rover Toolkit* and *Rover Mosaic* disclose content delivery techniques using the Internet and cell phone technology, the '616 patent pertains to cell phone technology, and RFC 1487 discloses a protocol used for simple accessing and recording of directory information, such as the location for a specific recipient identification.  This would be readily apparent to a person of ordinary skill in the art, particularly since each of *Rover Toolkit*, *Rover Mosaic*, the '616 patent and RFC 1487 also pertain to accessing lookup information for specific entities in a network.

518.    For at least these reasons, combining the respective features of *Rover Toolkit*, *Rover Mosaic*, the '616 patent and RFC 1487 is at most the mere application of known techniques to a known device ready for improvement to yield predictable results, rendering claim 58 unpatentable.

519.    In addition, the claimed invention is a combination of known prior art elements that maintain their respective properties or functions after they have been combined.

520.    Therefore, the combination of *Rover Toolkit*, *Rover Mosaic*, the '616 patent and RFC 1487 renders claim 58 of the '838 patent obvious.

521.    The combination of *Rover Toolkit*, *Rover Mosaic*, the '616 patent, and the '446 patent renders obvious all of the limitations of claim 63 of the '838 patent, particularly inosofar as claim 63 depends from independent claim 38.

522.    PNI is informed and believes, and thereupon alleges, that no combination of references was considered by the Examiner and discussed on the record disclosing a method of

1   notifying a cellular phone of information, "wherein the notification system correlates messages

2   in the content and storage and retrieval unit with subscriber listings," as recited in dependent

3   claim 63 of the '838 patent.

4           523.    PNI is informed and believes, and thereupon alleges, that the Examiner never

5   considered a reference or combination of references disclosing the addition of this feature in

6   dependent claim 63. The combination of *Rover Toolkit*, *Rover Mosaic*, the '616 Patent and the

7   '446 patent discloses or suggests all of these features, among others, as well as the feature

8   recited in independent claim 38 upon which claim 63 depends. Accordingly, the Examiner also

9   never considered a reference or combination of references disclosing the combination of

10  features recited in dependent claim 63, which depends directly from claim 38.

11          524.    A person of ordinary skill in the art would readily combine the respective

12  disclosures of *Rover Toolkit*, *Rover Mosaic*, the '616 patent, and the '446 patent to include in

13  the system disclosed in *Rover Toolkit*, for example, a step "wherein the notification system

14  correlates messages in the content and storage and retrieval unit with subscriber listings."  It

15  would have been obvious to one of ordinary skill in the art, for example, to "correlate messages

16  and other content with subscriber listings" so as to limit access to information based on

17  subscriptions, particularly since both Rover Toolkit and Rover Mosaic describe systems for

18  wireless and otherwise remote access to and delivery of email and Internet content, which at the

19  time of the invention of the '838 patent and before was well known to include both paid

20  subscription-based content and free content.

21          525.    A person of ordinary skill in the art would understand, and be motivated to

22  combine *Rover Toolkit*, *Rover Mosaic*, the '616 patent, and the '446 patent to incorporate the

23  teaching in the '446 patent relating to correlation of messages and other information with

24  subscriber listings, so as to permit wireless access of both free information and messaging as

25  well as subscription-based access to paid content.

26          526.    For at least these reasons, combining the respective features of *Rover Toolkit*,

27  *Rover Mosaic*, the '616 patent, and the '446 patent is at most the mere application of known

28  techniques to a known device ready for improvement to yield predictable results, rendering

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

93

1    claim 63 of the '838 patent unpatentable.

2        527.    In addition, the claimed invention is a combination of known prior art elements

3    that maintain their respective properties or functions after they have been combined.

4        528.    Therefore, the combination of *Rover Toolkit*, *Rover Mosaic*, the '616 patent, and

5    the '446 patent renders claim 63 of the '838 patent obvious.

6        529.    In reexamination proceedings by the PTO, HPL sought to amend claims and to

7    add new claims to the '838 patent.  The PTO has issued a NIRC for the '838 patent.  PNI is

8    informed and believes, and thereupon alleges, that as of the date of the filing of this second

9    amended counterclaim the PTO has not issued a reexamination certificate for the '838 patent.

10       530.    PNI intends to rely on additional prior art references that render the asserted

11   claims, and the new and amended claims of the '838 patent that are likely to issue when the

12   PTO issues a reexamination certificate, invalid as anticipated, and additional prior art references

13   and combinations of prior art references render the asserted claims of the '838 patent obvious.

14   ***The '757 Patent***

15       531.    For example, and without limitation, prior art that renders claims 2-18 of the '757

16   patent (and other claims, not asserted against PNI) invalid as obvious under 35 U.S.C. section

17   102(b) include, but are not limited to, the '327 patent (Tso).

18       532.    For example, and without limitation, combinations of prior art that render claims

19   1-20 of the '757 patent (and other claims, not asserted against PNI) invalid as obvious under 35

20   U.S.C. section 103 include, but are not limited to:

21       533.    The '327 Patent (Tso) (Claims 1 and 9-20 of the '757 Patent);

22       534.    The '327 Patent (Tso) in Combination with the '616 Patent (Bjorndahl) (Claims

23   1-20 of the '757 Patent);

24       535.    *Rover Toolkit*, *Rover Mosaic* and the '824 Patent (Lu) (Claims 1-2 and 4-20 of

25   the '757 Patent);

26       536.    *Rover Toolkit*, *Rover Mosaic*, the '824 Patent (Lu) and the '930 Patent (Masters)

27   (Claim 3 of the '757 Patent).

28       537.    None of the Bjorndahl, Lu and Masters patents was before the Examiner during

1  prosecution of the '757 patent.

2      538.    The *Rover Toolkit* reference, the *Rover Mosaic* reference and Tso patent were

3  cited in IDSs during prosecution of the '757 patent, but the Examiner used neither these

4  references nor any other prior art reference in making rejections during prosecution, and

5  allowed the application in the first action.

6      539.    The '757 patent pertains to "selective paging." According to the '757 patent, a

7  paging system notifies a paging transceiver that a message has been received or that information

8  is available but does not initially transmit the associated message or information. The user, upon

9  being notified of the page, can then use a system identifier and/or an information identifier that

10  points to the information to then download the entire message at a time convenient to the user,

11  which may allow the user to download messages or information at less-expensive off-peak

12  hours or allow the user to place the paging transceiver at a location where it can more easily

13  receive a message or information and reply to a message. Because the messages or other

14  information are not initially transmitted to the paging transceiver, the paging transceiver can

15  receive and store a greater number of pages with minimal increase in the size of memory.

16  Further, because entire messages or information are not automatically transmitted and because

17  the user can position the paging transceiver to issue a sufficiently strong reply to a message or

18  request for information, traffic in the paging system can be controlled and reduced. '757 patent,

19  3:18-61.

20      540.    The '327 patent was cited to the PTO during prosecution of the application that

21  resulted in the '757 patent in an IDS dated June 22, 2010, along with a large volume of other

22  prior art, but neither the '327 patent nor any other reference was discussed or used by the

23  Examiner in making any rejections during prosecution.  Nor did the Applicant draw any

24  particular attention to the '327 patent to highlight its materiality from among the large number

25  of references initially cited in the June 22, 2010 IDS.

26      541.    The '327 patent, as summarized earlier with respect to the '838 patent, is highly

27  material to the issued claims of the '757 patent.

28      542.    The '327 patent teaches that information identifiers are configured for display on

1   a mobile phone.  The '327 patent that information identifiers such as a resource identifier (*e.g.*,

2   the string "FFFFFF") or a URL (*e.g.*, "FTP://FTP.InfoCast.net/stories/warming.wav") comprise

3   alphanumeric characters, and one skilled in the art at the time of the priority date of the '757

4   patent would readily appreciate that mobile phones could display alphanumeric characters.

5       543.   The '327 patent presents a new, non-cumulative technological teaching that was

6   not previously considered and discussed on the record during the prosecution of the application

7   that resulted in the '757 patent.  As discussed above, the application that resulted in the '757

8   patent received a first action allowance; for that reason, technological teachings of the '327

9   patent were not considered and discussed on the record in connection with any rejection by the

10  Examiner.  Although the '327 patent was discussed by the Applicant in an IDS filed September

11  30, 2010, this IDS was found non-compliant and was neither considered nor discussed on the

12  record.

13      544.   The teachings of the '327 patent are new and non-cumulative with respect to the

14  references discussed by the Examiner in the Reasons for Allowance.  For example, the '327

15  patent teaches, among other things, the following features, recited in each of independent claims

16  1, 2, and 9 of the '757 patent, that have not been previously considered and discussed on the

17  record.  Accordingly, the '327 patent provides the foregoing new and non-cumulative

18  technological teachings that were not previously considered and discussed on the record during

19  the prosecution of the application that resulted in the '757 patent.

20      545.   The '616 patent, described above with respect to the '838 patent, qualifies as

21  prior art for the '757 patent under 35 U.S.C. § 102(b).

22      546.   The '616 patent was not considered by the Examiner during prosecution of the

23  application leading to the '757 patent.

24      547.   The *Rover Toolkit* reference, described above with respect to the qualifies as

25  prior art for the '757 patent under 35 U.S.C. § 102(b).

26      548.   The *Rover Toolkit* reference was cited by the Applicant in an IDS dated

27  September 7, 2010, but neither *Rover Toolkit* nor any other reference was discussed or used by

28  the Examiner in making any rejections during prosecution.

549.    The '824 patent, described above with respect to the '838 patent, qualifies as prior art for the '757 patent under 35 U.S.C. § 102(e).

550.    The '824 patent was not considered by the Examiner during prosecution of the application leading to the '757 patent.

551.    The '930 Masters patent was filed on July 11, 1996, and issued on February 16, 1999.

552.    As such, the Masters patent is prior art for the '757 patent under 35 U.S.C. § 102(e).

553.    HPL is in possession of a copy of the Masters patent as a result of reexamination proceedings pending before the U.S. Patent and Trademark Office.  It has specific knowledge of the contents of the Masters patent.

554.    The Masters patent was not considered by the Examiner during prosecution of the application leading to the '757 patent.

555.    The Masters patent discloses that some complex networks may include multiple sites with each site containing more than one e-mail server.  1:6 – 2:9 of the Masters patent. The Masters patent further discloses that the system administrator for such a complex network would need to implement an efficient and cost-effective manner of implementing e-mail services within the network.  2:10-15 of the Masters patent.  The Masters patent discloses that an efficient and cost-effective system may be implemented by load balancing in which at least two servers in a site of the complex network share the email load for that site.  4:59 – 5:53 of the Masters patent.

556.    *Rover Mosaic*, described above with respect to the '716 patent, qualifies as prior art for the '757 patent under 35 U.S.C. § 102(b).

557.    *Rover Mosaic* was cited by the Applicant in an IDS dated September 7, 2010, but neither *Rover Mosaic* nor any other reference was discussed or used by the Examiner in making any rejections during prosecution.

558.    The Tso patent discloses all of the limitations of claims 2-18 and, as such, anticipates these claims.  The Tso patent also independently renders obvious claims 1, and 9-20

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

97

1   of the '757 patent.

2        559.    The Tso patent presents a new, non-cumulative technological teaching that was

3   not previously considered and discussed on the record during the prosecution of the application

4   that resulted in the '757 patent.

5        560.    The application that resulted in the '757 patent received a first action allowance;

6   PNI is therefore informed and believes, and thereupon alleges, that the technological teachings

7   of the Tso patent were not considered and discussed on the record in connection with any

8   rejection by the Examiner.

9        561.    Although the Tso patent was discussed by the Applicant in an IDS filed

10  September 30, 2010, this IDS was found non-compliant and was neither considered nor

11  discussed on the record, because the IDS was filed after payment of the issue fee on September

12  21, 2010.  The Examiner gave the Applicant the option of withdrawing the '757 patent from

13  issue so that Tso, and the correspondence between the Applicant and a purported licensee

14  concerning Tso, could be considered.  The Applicant, however, never responded to the notice of

15  non-compliance.

16       562.    The teachings of the Tso patent are new and non-cumulative with respect to the

17  references discussed by the Examiner in the Reasons For Allowance.  In the Reasons For

18  Allowance, the Examiner only discussed the disclosures of European Patent Application

19  EP0777394 and U.S. Patent No. 5,557,659, and found, among other things, that the prior art of

20  record did not disclose all elements of any of the independent claims.

21       563.    No reference or combination of references disclosing each of the features of each

22  of independent claims 1, 2 and 9 of the '757 patent was considered by the Examiner on the

23  record.

24       564.    Neither European Patent Application EP0777394 nor U.S. Patent No. 5,557,659

25  (either on its own or in combination with the other) teaches a content provider utilizing a

26  content notification system (i) including an interface to a home location registry, (ii) configured

27  to process data into a paging call suitable for transmission to the wireless communication

28  device, and (iii) configured to transmit the paging call to the wireless communication device.

565.     Neither European Patent Application EP0777394 nor U.S. Patent No. 5,557,659 (either on its own or in combination with the other) teaches a content provider causing a message intended for the wireless communication device to be created, the message including: (i) an identifier of the content, and (ii) a system identifier that identifies the internet-accessible storage location at which the content is stored; wherein the content is not included in the message.

566.     Neither European Patent Application EP0777394 nor U.S. Patent No. 5,557,659 (either on its own or in combination with the other) teaches a content provider causing communication from the content notification system of a paging call including the content identifier and intended for the wireless communication device over the mobile radiotelephone network.

567.     Neither European Patent Application EP0777394 nor U.S. Patent No. 5,557,659 (either on its own or in combination with the other) teaches a content provider receiving a request message transmitted over the mobile radiotelephone network, the request message including (i) data corresponding to the identifier of the content and the system identifier received by the wireless communication device, and (ii) a command to perform on the content.

568.     Neither European Patent Application EP0777394 nor U.S. Patent No. 5,557,659 (either on its own or in combination with the other) teaches a content provider, subsequent to receiving the request message, causing the content to be delivered to the wireless communication device via the mobile radiotelephone network.

569.     The Tso patent, however, discloses each of the recited elements of claims 2-18 (including those listed above), and, independently, renders obvious claims 1, 9-20 of the '757 patent (which each include the elements listed above).  Accordingly, the Tso patent presents a new, non-cumulative technological teaching relating to each of claims 1-20 that was not previously considered and discussed on the record during prosecution of the application that resulted in the '757 patent.

570.     The Tso patent discloses and/or suggests each of the limitations of claims 1, and 9-20 of the '757 patent, as it discloses a "plurality of independently identifiable internet-

ANSWER, DEFENSES, FIRST COUNTERCLAIM, AMENDED SECOND COUNTERCLAIM, AND JURY DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

99

1    accessible storage locations."

2        571.    The combination of the Tso patent and the Bjorndahl patent either discloses or

3    renders obvious each of the limitations of claims 1-20 of the '757 patent.

4        572.    The combination of the Tso and Bjorndahl patents presents a new, non-

5    cumulative technological teaching that was not previously considered and discussed on the

6    record during the prosecution of the application that resulted in the '757 patent.

7        573.    The application that resulted in the '757 patent received a first action allowance;

8    PNI is therefore informed and believes, and thereupon alleges, that technological teachings of

9    neither the Tso and Bjorndahl patents nor any other reference were considered and discussed on

10   the record in connection with any rejection by the Examiner.

11       574.    Although the Tso patent was discussed by the Applicant in an IDS filed

12   September 30, 2010, this IDS was found non-compliant and was neither considered nor

13   discussed on the record, because the IDS was filed after payment of the issue fee on September

14   21, 2010.

15       575.    The combined teachings of the Tso patent and Bjorndahl patent are new and non-

16   cumulative with respect to the references discussed by the Examiner in the Reasons For

17   Allowance.  In the Reasons For Allowance, the Examiner only discussed the disclosures of

18   European Patent Application EP0777394 and U.S. Patent No. 5,557,659, and found, among

19   other things, that the prior art of record did not disclose all elements of any of the independent

20   claims, as described above.

21       576.    PNI is informed and believes, and thereupon alleges, that no reference or

22   combination of references disclosing each of the features of each of independent claims 1, 2 and

23   9 of the '757 patent was considered by the Examiner on the record.  In particular, neither

24   European Patent Application EP0777394 nor U.S. Patent No. 5,557,659 (either on its own or in

25   combination with the other) teaches the features identified previously in each of issued

26   independent claims 1, 2 and 9 of the '757 patent.

27       577.    The combination of the Tso patent and the Bjorndahl patent discloses and/or

28   suggests each of these recited elements as well as the remaining elements recited in each of

1    claims 1-20.

2        578.    PNI is informed and believes, and thereupon alleges, that a person of ordinary

3    skill in the art would readily combine the respective disclosures of the Tso and Bjorndahl

4    patents to include in the system disclosed in the Tso patent a Home Location Register as

5    disclosed in the Bjorndahl patent. This would be readily apparent to a person of ordinary skill in

6    the art, particularly because each of the Tso and Bjorndahl patents pertains to GSM systems, and

7    the Home Location Register disclosed in the Bjorndahl patent is a known GSM network

8    element.  Moreover, because both the Tso and Bjorndahl patents pertain to GSM systems, the

9    network architectures of the two patents are compatible so as to allow the Home Location

10   Register disclosed in the Bjorndahl patent to be readily combined with the GSM system as

11   disclosed in the Tso patent, as set forth in the claim chart above.

12       579.    For at least these reasons, combining the respective features of the Tso and

13   Bjorndahl patents is at most the mere application of known techniques to a known device ready

14   for improvement to yield predictable results, rendering claims 1-20 of the '757 patent

15   unpatentable.

16       580.    The claimed invention is a combination of known prior art elements that

17   maintain their respective properties or functions after they have been combined.  The

18   combination of the Tso and Bjorndahl patents renders claims 1-20 of the '757 patent obvious.

19       581.    The combination of *Rover Toolkit*, *Rover Mosaic*, and the Lu patent either

20   discloses or renders obvious each of the limitations of claims 1-2 and 4-20 of the '757 patent.

21       582.    The combination of the Rover reference, the Rover Mosaic reference, and the Lu

22   patent presents a new, non-cumulative technological teaching that was not previously

23   considered and discussed on the record during the prosecution of the application that resulted in

24   the '757 patent.

25       583.    The application that resulted in the '757 patent received a first action allowance.

26   For that reason, PNI is informed and believes, and thereupon alleges, that technological

27   teachings of neither *Rover Toolkit*, *Rover Mosaic*, and the Lu patent, nor any other reference,

28   were considered and discussed on the record in connection with any rejection by the Examiner.

ANSWER, DEFENSES, FIRST COUNTERCLAIM,
AMENDED SECOND COUNTERCLAIM, AND JURY
DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

101

584.     The combined teachings of *Rover Toolkit*, *Rover Mosaic*, and the Lu patent are new and non-cumulative with respect to the references discussed by the Examiner in the Reasons For Allowance.  In the Reasons For Allowance, the Examiner only discussed the disclosures of European Patent Application EP0777394 and U.S. Patent No. 5,557,659, and found, among other things, that the prior art of record did not disclose all elements of any of the independent claims.

585.     Based on this discussion of prior art references on the record, PNI is informed and believes, and thereupon alleges, that no reference or combination of references disclosing each of the features of each of independent claims 1, 2 and 9 of the '757 patent was considered by the Examiner on the record.  In particular, neither European Patent Application EP0777394 nor U.S. Patent No. 5,557,659 (either on its own or in combination with the other) teaches the features previously identified in each of issued independent claims 1, 2 and 9 of the '757 patent.

586.     The combination of *Rover Toolkit*, *Rover Mosaic*, and the Lu patent discloses and/or suggests each of these recited elements as well as the remaining elements recited in each of claims 1-2 and 4-20.  For this reason, the combination of *Rover Toolkit*, *Rover Mosaic*, and the Lu patent presents a new, non-cumulative technological teaching relating to each of claims 1-2 and 4-20 that was not previously considered and discussed on the record during the prosecution of the application that resulted in the '757 patent.

587.     PNI is informed and believes, and thereupon alleges, that a person of ordinary skill in the art would readily combine the respective disclosures of *Rover Toolkit*, *Rover Mosaic*, and the Lu patent to include in the system disclosed in the *Rover Toolkit* and *Rover Mosaic* references a Home Location Register and SMS messaging capability as disclosed in the Lu patent.

588.     Each of the *Rover Toolkit*, *Rover Mosaic*, and the Lu patent pertains to cellular and wireless communication systems, and the Home Location Register as well as SMS messaging capability as disclosed in the Lu patent are well-known standardized cellular technologies.  The person of ordinary skill in the art would have in particular known that the wireless and cellular communications between the Rover servers and the mobile hosts of the

ANSWER, DEFENSES, FIRST COUNTERCLAIM, AMENDED SECOND COUNTERCLAIM, AND JURY DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

102

*Rover Toolkit* could be accomplished through the well-known GSM cellular communications telephony technology, of which each of the Home Location Register and SMS messaging capability is a part.  Additionally, the person of ordinary skill in the art would readily combine the respective disclosures of *Rover Toolkit* and *Rover Mosaic* for at least the reason that *Rover Toolkit* and *Rover Mosaic* pertain to the same system.

589.    Combining the respective features of *Rover Toolkit*, *Rover Mosaic* and the Lu patent is at most the mere application of known techniques to a known device ready for improvement to yield predictable results, rendering claims 1-2 and 4-20 of the '757 patent obvious.

590.    In addition, the claimed invention is a combination of known prior art elements that maintain their respective properties or functions after they have been combined.

591.    The combination of the Rover reference, the Rover Mosaic reference, and the Lu patent renders claims 1-2 and 4-20 of the '757 patent obvious.

592.    For substantially the same reason, the combination of *Rover Toolkit*, *Rover Mosaic*, the Lu patent and the Masters patent either discloses or renders obvious each of the limitations of claim 3 of the '757 patent.

593.    The combination of *Rover Toolkit*, *Rover Mosaic*, the Lu patent and the Masters patent presents a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that resulted in the '757 patent.

594.    The application that resulted in the '757 patent received a first action allowance. For that reason, PNI is informed and believes, and thereupon alleges, that technological teachings of neither *Rover Toolkit*, *Rover Mosaic*, the Lu patent and the Masters patent nor any other reference were considered and discussed on the record in connection with any rejection by the Examiner.

595.    The combined teachings of *Rover Toolkit*, *Rover Mosaic*, the Lu patent and the Masters patent are new and non-cumulative with respect to the references discussed by the Examiner in the Reasons For Allowance.  In the Reasons For Allowance, the Examiner only

ANSWER, DEFENSES, FIRST COUNTERCLAIM, AMENDED SECOND COUNTERCLAIM, AND JURY DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

103

1    discussed the disclosures of European Patent Application EP0777394 and U.S. Patent No.

2    5,557,659, and found, among other things, that the prior art of record did not disclose all

3    elements of any of the independent claims.

4        596.    Based on this discussion of prior art references on the record, PNI is informed

5    and believes, and thereupon alleges, that no reference or combination of references disclosing

6    each of the features of independent claim 2 of the '757 patent (from which claim 3 depends) was

7    considered by the Examiner on the record.  In particular, neither European Patent Application

8    EP0777394 nor U.S. Patent No. 5,557,659 (either on its own or in combination with the other)

9    teaches the features described above that are also recited in independent claim 2 of the '757

10   patent.

11       597.    The combination of the *Rover Toolkit*, *Rover Mosaic*, the Lu patent and the

12   Masters patent discloses and/or suggests each of these recited elements as well as the remaining

13   elements of claim 3.  For this reason, the combination of *Rover Toolkit*, *Rover Mosaic*, the Lu

14   patent and the Masters patent presents a new, non-cumulative technological teaching relating to

15   claim 3 that was not previously considered and discussed on the record during the prosecution

16   of the application that resulted in the '757 patent.

17       598.    A person of ordinary skill in the art would readily combine the respective

18   disclosures of *Rover Toolkit*, *Rover Mosaic* and the Lu patent to include in the system disclosed

19   in the *Rover Toolkit* and *Rover Mosaic* references a Home Location Register and SMS

20   messaging capability as disclosed in the Lu patent, for the reasons described above.

21       599.    A person of ordinary skill in the art would readily combine the respective

22   disclosures of *Rover Toolkit* and *Rover Mosaic* references and the Masters patent to include on

23   the same site as the Rover server additional e-mail servers as disclosed in the Masters patent.

24       600.    The *Rover Toolkit* article discloses that the Rover server includes e-mail server

25   functionality, and the Masters patent discloses that more than one e-mail server may be included

26   in the same site in a network, with load balancing performed across the plurality of e-mail

27   servers on the same site, to efficiently and cost-effectively transport e-mail traffic among the

28   sites of the network.

601.    For at least these reasons, combining the respective features of the *Rover Toolkit*, *Rover Mosaic*, and the Masters patent is at most the mere application of known techniques to a known device ready for improvement to yield predictable results.

602.    The embodiment resulting from such a combination comprises a combination of known prior art elements that maintain their respective properties or functions after they have been combined.

603.    Because one of ordinary skill in the art would be motivated to combine the teachings of *Rover Toolkit*, *Rover Mosaic*, the Lu patent and the Masters patent as discussed above, and because these references in combination disclose all of the elements of claim 3, these references render claim 3 obvious.

604.    In reexamination proceedings by the PTO, HPL sought to amend claims and to add new claims to the '757 patent.  The PTO has issued a NIRC for the '757 patent.  PNI is informed and believes, and thereupon alleges, that as of the date of the filing of this second amended counterclaim the PTO has not issued a reexamination certificate for the '757 patent.

605.    PNI intends to rely on additional prior art references that render the asserted claims, and the new and amended claims of the '757 patent that are likely to issue when the PTO issues a reexamination certificate, invalid as anticipated, and additional prior art references and combinations of prior art references render the asserted claims of the '757 patent obvious.

**PRAYER FOR RELIEF**

606.    Wherefore, PNI prays for judgment that:

A.    HPL's Complaint against PNI be dismissed in its entirety with prejudice;

B.    HPL is not entitled to the relief prayed for from PNI in its Complaint, or to any relief from PNI whatsoever;

C.    The '757 patent has never been, and is not now, infringed by PNI or by any other person using PNI's services in this District or anywhere else in the Unites States;

D.    The '757 patent is invalid, unenforceable, and void against PNI;

E.    The '716 patent has never been, and is not now, infringed by PNI or by any other person using PNI's services in this District or anywhere else in the Unites States;

ANSWER, DEFENSES, FIRST COUNTERCLAIM, AMENDED SECOND COUNTERCLAIM, AND JURY DEMAND (Civil Case No.: 2:11-cv-02304 PHX DGC)

105

F.     The '716 patent is invalid, unenforceable, and void against PNI;

G.     The '838 patent has never been, and is not now, infringed by PNI or by any other person using PNI's services in this District or anywhere else in the Unites States;

H.     The '838 patent is invalid, unenforceable, and void against PNI;

I.     PNI be awarded its costs (including expert fees), disbursements, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

J.     PNI be awarded such other and further relief as the Court may deem just and proper.

<u>DEMAND FOR JURY TRIAL</u>

In accordance with Fed. R. Civ. P. 38(b), PNI demands a trial by jury on all issues so triable.

Respectfully Submitted,

DATED: February 21, 2012     By    */s/ Laura E. Muschamp*

Laura E. Muschamp (AZ Bar # 017531)
lmuschamp@cov.com
COVINGTON & BURLING LLP
9191 Towne Centre Drive
6th Floor
San Diego, CA 92122-1225
T: (858) 678-1803
F: (858) 678-1603

*Attorneys for Defendant Phoenix Newspapers, Inc.*

1

<u>Certificate of Service</u>

2          The undersigned hereby certifies that all counsel of record who are deemed to

3   have consented to electronic service are being served with a copy of this document via the

4   Court's CM/ECF system on this 21st day of February 2012.

5

6                              By____/s/ *Laura E. Muschamp*_____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28